No. 81-194

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

IRVIN S. NAYLOR,

Plaintiff and Appellant,

vs.

JOHN P. HALL, SHERRILL HALL,
and SKI YELLOWSTONE, INC.,

Defendants and Respondents.

---

Appeal from: District Court of the Eighteenth Judicial District,
In and for the County of Gallatin
Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellant:

Gregory O. Morgan argued, Bozeman, Montana
Albert G. Blakey, III argued, York, Pa.

For Respondents:

Landoe, Brown Law Firm, Bozeman, Montana
J. Robert Planalp argued, Bozeman, Montana

---

Submitted: July 8, 1982

Decided: October 7, 1982

Filed: OCT 7 1982

_Thomas J. Kearney_
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Plaintiff, Irvin Naylor (Naylor), sought specific performance of a contract for the purchase of real property from defendants Hall, and Ski Yellowstone, Inc., herein referred to as Hall. The District Court of the Eighteenth Judicial District, Gallatin County, tried the case without a jury, and refused to grant Naylor specific performance. We reverse the District Court.

This case is a companion to Supreme Court case No. 81-222, Ski Roundtop, Inc., individually and derivatively in behalf of Ski Yellowstone, Inc. v. John P. Hall and others, to be decided at a later date by this Court.

Naylor raises a single issue on review: Whether the agreements between the parties constituted a specifically enforceable, valid option contract.

The individuals involved in this action were all shareholders and officers in the Montana corporation, Ski Yellowstone, which is developing a four-seasons resort in the Hebgen Lake area in Gallatin County. Plaintiff Naylor was chairman of the board of directors in 1975-76. Defendant John Hall was a director and is presently the chief executive officer and majority stockholder. Hans Geier was president at the time the disputed agreements were made and, under the corporation's bylaws, was authorized to execute contracts for the corporation. Fred Pack is a Bozeman realtor, whose agency was authorized to sell lots in the Bear Trap Subdivision owned by Ski Yellowstone.

Fred Pack wrote Naylor and offered him the opportunity to purchase lots in the Bear Trap Subdivision at the listed

-2-

price less a ten percent commission. On February 25, 1975, Naylor replied:

"Thank you for your letter of February 20, inviting me to acquire at a 10% discount any of the lots that are shown on the plats that were enclosed with that letter. I am pleased to make the following offer on lot #7 in Bear Trap Ranch subdivision #1:

"1. A purchase price of $11,700.

"2. A deposit now of $500.00 cash.

"3. $5,000 to be paid at the time my $5,000 'bonus' has been offered to me by Ski Yellowstone, Inc.

"4. The balance of $6,200 to be paid in cash within 90 days of the accomplishment of #3 above. At this time the lot is to be transferred to me with good, insurable, fee-simple, marketable title.

"If this proposal is acceptable as presented, please have Hans sign the enclosed copy of this letter as President of Ski Yellowstone, Inc., and return it to me in the enclosed self-addressed and stamped envelope, upon receipt of which I will promptly send you the $500.00 deposit."

The letter was marked "Approved March 5, 1975, Hans Geier, President, Ski Yellowstone, Inc." and returned to Naylor. On May 8, 1975, Pack acknowledged receipt of the $500 deposit forwarded by Naylor, and informed Naylor that he (Pack) had placed the deposit in a trust account "to be held there until the conditions as set forth in your letter of February 25, 1975 have been complied with and we will be able to deliver to you a title to said lot free of all encumbrances."

On March 29, 1976, Naylor mailed the following "clarification" to Hans Geier:

"It occurred to me a couple of days ago that a point of clarification in my proposal to you of February 25, 1975 referring to my offer (which you accepted) on lot #7 in Bear Trap Ranch subdivision #1 should be noted:

-3-

"If by January 1, 1980 the '$5,000 bonus has (not) been offered to me by Ski Yellowstone, Inc.', then I should have the prerogative of either acquiring the lot for a cash payment of $11,200 within 90 days of January 1, 1980 or a return of my $500.00 cash deposit (without interest).

"I selected the date of January 1, 1980 as being totally arbitrary - a time by which I hopefully assume the problems relating to the obtainment of the Forest Service Permit will have been resolved.

"If you agree to this clarification of our agreement as reflected in my letter of February 25, 1975, I would appreciate it if you would execute the enclosed copy of this letter and return it to me in the self-addressed and stamped, enclosed envelope."

The letter was returned to Naylor with Geier's approval written on it as follows:

"I accept the above clarification.
Hans Geier, President
Ski Yellowstone, Inc.
April 11, 1976
Verbal Approval by F. L. Pack. . ."

On January 10, 1977, John Hall, who had in 1976 gained control of Ski Yellowstone, and was Executive Vice-President of the corporation, agreed to purchase the same lot (Lot 7, in Block 2) from Ski Yellowstone for $11,000. Payment was to be settled within six months by the application to the purchase price of corporate credit issued to John Hall for services rendered. A $10,000 corporate credit was subsequently applied to the purchase price of the lot.

On May 2, 1977, Naylor filed a notice of purchaser's interest with the Gallatin County Clerk and Recorder.

On June 21, 1977, John and Sherrill Hall, acting as officers of Ski Yellowstone, conveyed the Bear Trap lot to themselves as joint tenants, by warranty deed, and the next day filed the deed with the Gallatin County Clerk and Recorder.

-4-

The Forest Service permit had not issued by January 1, 1980. On January 7, 1980, Naylor, through his attorney, notified Pack that he "elected to exercise his option to purchase the lot in Bear Trap Ranch Subdivision." Naylor demanded that Ski Yellowstone specifically perform its contract for the sale of the lot, and supply him with "a copy of a title report showing a marketable title." Ski Yellowstone did not meet Naylor's demands, and on March 7, 1980, Naylor filed this action for specific performance in the District Court.

The case was heard, in combination with several connected cases, in September of 1980. The District Court entered findings of fact and conclusions of law on January 2, 1981·

The District Court held that following the "clarification" of March 29, 1976, there was no mutually binding contract because Naylor could, "at his sole prerogative, relieve himself from any liability to purchase the lot." In addition, the District Court concluded that there was no consideration because Naylor could, at his election, demand the return of the $500 deposit. An analysis of the contract compels a different conclusion.

Under the February 25, 1975, letter agreement, Naylor was obligated to purchase the lot when Ski Yellowstone paid him his $5,000 bonus, which in turn depended upon the issuance by the Forest Service of its permit for Ski Yellowstone. This obligation continued as to Naylor without limit in time. In addition, there was no means by which he could purchase at an earlier date than the date on which Ski Yellowstone offered him his bonus. As to Ski Yellowstone, under this letter agreement, it was obligated to hold open the purchase of the lot until such time as the permit was issued by the Forest Service, which again had no limit in the future, and therefore left Ski Yellowstone with an obligation to sell not limited in time.

-5-

By the letter agreement of March 29, 1976, several changes were introduced into the contract relationship. Through December 31, 1979, the arrangement was the same as between the parties, as it had been under the old agreement. However, the effect of the agreement was to terminate this obligation on the part of Ski Yellowstone to sell in the event that by January 1, 1980, the Forest Service permit had not been issued. At that point in time, an option arrangement came into effect, under which Naylor could either have his $500 back or purchase the lot for an additional cash payment of $11,200. Clearly, the March 29, 1976, letter agreement was mutually beneficial to the parties. As to Ski Yellowstone, its obligation to continue to hold the lot for the future purchase was terminated as of January 1, 1980, unless, within ninety days, Naylor elected to purchase. In addition, if Naylor did elect to purchase, he was required to pay $11,200 of his own cash, without applying a $5,000 bonus which would have been furnished by Ski Yellowstone upon issuance of the Forest Service permit under the prior agreement. As to Naylor, he now acquired for the first time the capacity to purchase the lot immediately for cash after January 1, 1980, even though no Forest Service permit had been issued. He also acquired the right to elect to have his $500 cash deposit returned if he wished to surrender his right to purchase the lot.

We find that the benefits and obligations on the part of each of the parties under the letter agreement of March 29, 1976, were sufficient to constitute a mutually binding contract between the parties.

We also find that there was consideration for the March 29, 1976, letter agreement. The relinquishment of a legal or contract right is sufficient consideration to support a

-6-

contract. Rickett v. Doze (1979), _____ Mont. _____, 603 P.2d 679, 36 St.Rep. 2170; 17 Am.Jur.2d Contracts § 119, at 465; Sunburst Oil and Gas Company v. Neville (1927), 79 Mont. 550, 257 P. 1016. It is also well-established that a contract may be modified by subsequent agreement if that subsequent agreement also complies with the requirements of a contract. Edwards v. Peavey Company (1976), 170 Mont. 45, 549 P.2d 1082. The 1976 letter agreement, as proposed by Naylor and accepted by Ski Yellowstone, was a mutually acceptable modification of the 1975 contract. The consideration in terms of the changes in rights and obligations on the part of both Naylor and Ski Yellowstone constitutes adequate consideration for the 1976 agreement. We find that the 1976 agreement was supported by consideration and sufficiently complied with contract requirements to constitute a modification of the original agreement. That agreement was in effect when John and Sherrill Hall purchased the lot from Ski Yellowstone.

Upon the failure of the Forest Service to issue its permit by January 1, 1980, the option rights of Naylor came into effect. At that time, Naylor properly exercised his right to purchase the lot for a cash purchase price of $11,200 (in addition to the $500 deposit) as authorized under the 1976 letter agreement. Hall has argued at length that Naylor had no right to specific performance by Ski Yellowstone under the 1976 agreement because it could not compel Naylor to purchase, and because Naylor had the right to ask for his money back, and that as a result, specific performance could not be awarded to Naylor because Ski Yellowstone was not also entitled to specific performance. This argument, based upon the original 1976 agreement,

-7-

ignores the position in which the parties found themselves on January 1, 1980. The portion of the contract under which Naylor then acted is the option portion which came into effect on January 1, 1980. As is true with all option agreements, the party to whom the option is granted has the power to determine when and if he will purchase in accordance with the option. Until a decision to purchase is made by the option holder, the owner of the property does not have a right of specific performance, although as was the case here, the option holder may be required to choose between the options within a given period. When, as Naylor did, the option holder exercises his option to purchase, we then find a binding contractual arrangement under which the option holder (Naylor) is obligated to purchase and the owner (Ski Yellowstone) is obligated to sell. At that point, both parties have a binding contractual obligation under which specific performance can be awarded under section 27-1-414, MCA, and cases interpreting the same.

We therefore conclude that there was a mutually binding contract under the March 29, 1976, letter agreement for which there was adequate consideration, and which was of a nature which would allow specific performance on the part of either party.

Hall argues that the 1976 agreement is too uncertain to be specifically enforced because it was not known when, if ever, the Forest Service permit would issue, and it was not clear which option Naylor would elect if the permit was not issued by January 1, 1980.

Absolute certainty in every detail is not a prerequisite for specific performance. Keaster v. Bozik (1981), ___ Mont.

_____, 623 P.2d 1376, 1381, 38 St.Rep. 194, 201; Gropp v. Lotton (1972), 160 Mont. 415, 503 P.2d 661; Steen v. Rustad (1957), 132 Mont. 96, 313 P.2d 1014. Here the parties and property are identified, the price is established, and the substantive terms of the agreement are clear. Indeed, the 1976 clarification renders the agreement more certain and more easily enforceable. We do not find the agreement to be so uncertain as to preclude specific performance.

This Court has recognized specific performance as an appropriate remedy for the breach, by the seller, of a contract to sell real property. Brown v. Griffin (1968), 150 Mont. 498, 436 P.2d 695; Section 27-1-419, MCA.

In Myhre v. Myhre (1976), 170 Mont. 410, 419, 554 P.2d 276, 281, we stated:

> "The rule seems to be that one who acquires or purchases property, knowing that the property is subject to a contract to be sold to another, may be compelled to perform the contract in the same manner and to the same extent as his grantor would have been liable to do had the grantor not made the transfer to him. Moore v. Crawford, 130 U.S. 122, 32 L.Ed. 878, 9 S.Ct. 447; 71 Am.Jur.2d Specific Performance."

Here the record shows that Hall, managing officer, director and stockholder of Ski Yellowstone, in those capacities, as well as individually, was aware of the agreement between Ski Yellowstone and Naylor. Notwithstanding that knowledge, Hall and his wife, acting as executive officers of Ski Yellowstone, sold and conveyed the property to themselves as individuals. As a result, they individually are liable to perform the contract in the same manner that Ski Yellowstone was obligated prior to the sale of the lot to Hall. Naylor therefore is entitled to specific performance against defendants Hall.

We reverse the District Court and remand the case for judgment by the District Court which is consistent with this opinion.

_____
                    Justice

We Concur:

_____
        Chief Justice

_____

_____

_____
            Justices

-10-