No. 81-222

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

SKI ROUNDTOP, INC., individually and
derivatively on behalf of SKI
YELLOWSTONE INC.,

Plaintiff and Appellant,

vs.

JOHN P. HALL, FREDERICK L. MORGENTHALER
and CHARLES R. MILLER, JR.,

Defendants and Respondents.

---

Appeal from:  District Court of the Eighteenth Judicial District,
In and for the County of Gallatin
Honorable W. W. Lessley, Judge presiding

Counsel of Record:

For Appellant:

Gregory O. Morgan argued, Bozeman, Montana
Albert Blakey, III argued, York, Pa.

For Respondents:

Landoe, Brown Law Firm, Bozeman, Montana
J. Robert Planalp argued, Bozeman, Montana
Morrow, Sedivy, Olson & Eck, Bozeman, Montana

---

Submitted:  September 14, 1982

Decided:  January 31, 1983

JAN 31 1983

Filed: *Ethel M. Harrison*

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

This case is a companion case to Naylor v. Hall (1982), ____ Mont. ____, 651 P.2d 1010, 39 St.Rep. 1953.

Plaintiffs, minority shareholders in Ski Yellowstone, Inc., appeal from the decision of the Eighteenth Judicial District Court for Gallatin County, denying them relief in this stockholders' derivative action arising from the alleged misconduct of several of the officers and directors of Ski Yellowstone, a Montana corporation. We affirm the District Court with one exception.

The following issues are presented to this Court by plaintiffs:

(1) Did John Hall breach a duty to minority stockholders, with respect to the "C" and "D" stock issues?

(2) After acquiring control of the corporation, did John Hall engage in a course of conduct which was oppressive to minority stockholders?

(3) After acquiring control of the corporation, was John Hall guilty of fraud and self-dealing?

(4) Was the amendment of the corporation's Articles of Incorporation, which authorized stock for the "C" and "D" issues, valid under Montana law?

(5) What relief is appropriate under all of the circumstances?

Ski Yellowstone is a Montana corporation which planned to develop a four-seasons resort in Gallatin County. It was organized in 1973 by stockholders in a Pennsylvania corporation, Ski Roundtop, Inc., which is a minority stockholder in Ski Yellowstone. The events on which this action is based occurred primarily in 1975 and 1976, during which time John

-2-

Hall obtained control of Ski Yellowstone.

The original stock issue which took place in 1973 was 1,450,000 shares, $1.00 par value, which were relatively evenly distributed among twenty-one shareholders. The shares were issued at a cost of $1.00 per share, 1,050,000 shares for cash in the amount of $1,050,000, and 400,000 shares for land having a value of $400,000. With the exception of defendant John Hall and his family corporation, J.M.S. Corporation, all of the shareholders were friends and associates of Irvin S. Naylor, the head of Ski Roundtop and the primary organizer, with Hans Geier, of Ski Yellowstone. Naylor originally was in a controlling position in Ski Yellowstone as well as in Ski Roundtop.

Ski Yellowstone was low on funds by 1974. The issue of the Forest Service use permit to develop a ski area, which was essential to the success of Ski Yellowstone, had been delayed. In order to finance the expense of delay, in November, 1974, $290,000 worth of Series "A" debentures were issued. These debentures earned interest and were convertible into the common stock of Ski Yellowstone at $.20 per share. The dilution of the shares from the original $1.00 per share paid in 1973 was recognized by Naylor, but was deemed necessary to prevent bankruptcy. John Hall purchased his $5,000 pro rata preemptive share of the Series "A" debentures and also purchased by agreement an additional $42,500 worth of overage (debentures offered to but not purchased by other shareholders who were first entitled to purchase). Plaintiffs contend there was a "gentlemen's agreement" that the Series "A" debentures would not be converted into stock unless the company was sold.

-3-

By 1975 Ski Yellowstone again was short of capital and in July, 1975, $200,000 worth of Series "B" debentures were issued to the shareholders of the company. Series "B" debentures earned the same interest rate and had the same conversion privileges as Series "A" debentures.

John Hall became a director (one of ten) of Ski Yellowstone in June, 1975. During 1975 and 1976 John Hall obtained greater control of Ski Yellowstone by joining several "allies" in acquiring all unpurchased Series "A" debentures, converting those "A" debentures into stock, thereby increasing the number of Series "B" debentures he could purchase; subscribing to Series "B" debentures and converting the same into stock. The result of these activities was to create a controlling block of shares. Other shareholders also converted Series "A" and "B" debentures into common stock, with the exception of plaintiffs Naylor and Geier.

The new voting majority of stockholders reduced the number of directors from ten to seven, and elected Fred Pack as chairman of the board in place of Irvin Naylor. The corporation authorized the sale of $200,000 of Series "C" debentures with the same terms as the "A" and "B" debentures. The success of the issue required a pledge of 80 percent of the issue. The issue failed. John Hall distributed a letter to Ski Yellowstone shareholders expressing general confidence in the venture, but pointing out that expenses were likely to be higher than anticipated.

In considering the questioned stock issues, it is important to keep in mind the following findings of fact on the part of the District Court: Ski Yellowstone was formed

in 1973 by Naylor and Hans Geier, both residents of Pennsylvania. Naylor had extensive experience in obtaining venture type capital for business entities and Geier had twenty years experience in the ski industry, including sixteen in upper-level management. The purpose of Ski Yellowstone was to acquire private lands and the necessary permits to use government land to develop its resort. Naylor simultaneously was chairman of the board of Ski Yellowstone and chief executive officer of Ski Roundtop, which operates ski resort areas in Pennsylvania. Initially, Naylor represented to shareholders of Ski Yellowstone that within a short time a shareholder could sell his stock for $10 a share. Ski Yellowstone purchased land and undertook a series of studies, applied for a Forest Service permit, and filed extensive environmental data in 1973. At that time, the Forest Service changed its approach and decided to process the application in the context of a larger regional study, which led to a series of delays. By 1974 it was obvious that Geier was unable to quickly obtain the Forest Service permit, and Naylor caused John Maples, a plaintiff, to be hired for the purpose of liquidating Ski Yellowstone or selling the corporation. In 1974, John Maples represented to the shareholders that the value of their stock could be as low as $.12 per share. Following the offering to the shareholders of Series "C" debentures in 1976, plaintiff Rosenmiller, also a director of Ski Roundtop and a close business associate of Naylor, advised Naylor of the conclusions of his committee that Ski Roundtop should decline to invest in Series "C" debentures because their investments should be made in Ski Roundtop's marketing area,

-5-

that is the ski business in Pennsylvania, and that Ski Roundtop should <u>not</u> convert Series "A" and "B" to stock. Because of its insight into the thinking and actions on the part of the plaintiffs, the District Court set forth the Rosenmiller letter of May 18, 1976, to Naylor in its findings as follows:

> "I have concluded my discussions with my Committee relative to the advisability of Ski Roundtop converting its Ski Yellow-stone Debentures into Common Stock and subscribing to the forthcoming Series "C" Debenture issue. It is the unanimous opinion of our Committee that we should do the following:

> "1) We advise that Ski Roundtop, Inc. honor its commitment under the existing Series "B" Convertible Notes subscrip-tion, calling for a payment of $4,843.60. Although this Note offers no return for one year it does provide a $.20 a share conversion feature if it is later deter-mined that the stock is, in fact, worth that or a figure in excess of $.20 a share. Most importantly, this Debenture has been substantially collateralized by valuable real estate which has less demands placed against it due to the recent conversion of the Hall notes.

> "2) It is the unanimous recommendation that we <u>do not</u> convert our Series "A" and Series "B" notes into common stock of Ski Yellowstone, Inc. The only rationale for doing so would be to return the control of the Company into its former hands but the likelihood of this occurring, is remote at best. It is felt by our Group that we may be in a stronger position to allow the new management to go forward and if successful, we can convert at a later date and hopefully realize a return and profit on our investment. If new management is unsuccessful, we will be able to write off the common equity portion of our investment against future earnings, developing a tax shelter which will pay for a portion of the loss incurred. We will further be in a good position to take legal action against the new management in the event they have acted not in the best interest of all shareholders.

"3) Regarding the proposed $200,000 Series "C" Debenture, we would recommend against any further investment in Ski Yellowstone, Inc. at this time. Our rationale being that our investments should be made in Ski Roundtop's marketing area, advancing that which we do best and profit from most, namely, the ski business and recreation generally here in York and Adams Counties.

"This constitutes the recommendations of Jacob A. Barnhart, Dr. Anthony Perlman and W. F. O. Rosenmiller."

As noted by the District Court, the letter points out the conclusion on the part of those making their recommendations to Naylor: not to convert stock because of the financial risk; consider conversion at a later date if the new management is successful; if new management is unsuccessful, write off against earnings as a tax shelter; take legal action in the event the new management has not acted in the best interest of shareholders; and finally, recommending against any further investment in Ski Yellowstone.

John Hall also circulated a letter dated May 21, 1976, to Ski Roundtop's board of directors, suggesting that, while he as an individual could convert his debentures to stock for the good of the company, Ski Roundtop would be "ill-advised" to sacrifice the interest on the debentures and speculate by so converting. Ski Roundtop might, Hall said, "open itself to minority shareholder suits," if it chose to convert.

The "C" Series debenture issue failed, although John Hall subscribed to the number allocated to him, conditional upon the success of the issue. The Ski Roundtop shareholders did not subscribe.

A stockholders' meeting noticed on July 1, 1976, was held July 16, 1976. It was preceded by a directors' meet-

ing. At that meeting, over Hall's protests that the move would dilute the stock, Ski Yellowstone directors voted to issue company stock in the amount of $500,000 at $.05 a share. The stockholders also approved the issue. (A $.10 share issue was voted down.)

In early August, 1976, a falling out took place between Naylor and Hall, accompanied by a series of acrimonious exchanges personally and by mail, which led Naylor to withdraw his support of the "C" Series issue and to exercise his right to review the issue for sixty days as set forth in the 1973 founders' agreement, thus moving the closing date for subscriptions to October 4, 1976. Naylor's friends, and Hall as well, then also withdrew their subscribed support and the issue, which had until then been over 80 percent subscribed, appeared doomed to fail. The financial situation of the corporation was desperate; land payments and salaries were due and bank notes overdrawn; even the company's president, Geier, was convinced Ski Yellowstone would fail. In October, 1976, Hall subscribed to a total of $401,000 worth of "C" shares, notwithstanding his previous indicated intention to subscribe to $100,000 to $150,000 worth of the shares. Four other shareholders subscribed for $10,480 worth of stock. John Maples, a minority shareholder and one of the plaintiffs, wrote Hall a letter stating, "Congratulations--you have saved the corporation."

When Hall paid the 25 percent due on the "C" Series subscription in October and assumed ownership of 25 percent of the stock, he became owner of 50.7 percent of the Ski Yellowstone stock outstanding (full payment would have given

-8-

him over 77 percent ownership). Naylor and three associates resigned from the board of directors and were replaced by two personal friends of Hall who were not shareholders. The new board made a number of changes, including (1) changing the bylaws to place more power in the chairman, Hall; (2) agreeing to postpone further payments due on the "C" issue, first for one month and then (on January 7, 1977) until needed; (3) adopting a two-tier budget, under which the "C" Series payments would be applied to those long-term financial obligations essential to the survival of the company, and the costs of obtaining the Forest Service permit would be funded by a subsequent stock issue.

On December 10, 1976, Ski Yellowstone sought to raise $450,000 in cash by its offer of the "D" Series stock issue of 9,000,000 shares at $.05 per share, with purchase rights to be allocated in proportion to shares owned as of that date. The prospectus notified shareholders of the first postponement of "C" Series payments, and the adoption of the two-tier budget suggested by director Morgenthaler. It also informed them that the sixty-day review period would be shortened due to the pressing need for cash and would expire on December 23, 1976. The prospectus stated:

> "Should it be determined that a shareholder of the Company retains his right to exercise his rights after December 23, 1976, the Company may be required to issue additional shares to such shareholders."

The subscription to the initial "D" Series attracted virtually no subscribers, only one or two small pledges. One shareholder, John Maples, notified John Hall that he refused to return his proxy and waive his sixty-day review right. As a result, on January 7, 1977, the Ski Yellowstone directors

decided that the offering was unsuccessful, dropped the price of shares to $.01 each, and increased the number of shares offered to 45,000,000. The amended prospectus indicated the postponement of payments due on the "C" issue until needed, and warned, as had those for earlier issues, that failure to subscribe would result in substantial dilution of ownership, should the issue succeed. The number of payments was increased from two to four, the first due February 10, 1977, and the last three due on specified dates "or thereafter at the call of the Directors." The stated purpose of the amendment was to "promote the success of the offering." The closing date for the offering was extended to February 10, 1977. Only John Hall and defendant Morgenthaler were present at the January 7, 1977 meeting.

The "D" issue was successful, again because of John Hall's subscription to $400,000 of stock, with $2,725 of stock subscribed by four other stockholders. As a result of his subscription to the Series "D" issue and his previous subscription to the Series "C" issue, Hall gained the right to obtain 94 percent stock ownership in the corporation. The plaintiffs point out that he had invested only 37 percent of the money invested in order to get that share of ownership. A letter dated March 10, 1977, from John Hall to the shareholders indicated that the first payment on the "D" issue was sufficient to meet the present needs, and that the further installments would be called for as needed.

From autumn of 1976 on, Hall rejected Naylor's repeated attempts to sell Hall his interest in Ski Yellowstone. Naylor commenced this shareholders' suit in Pennsylvania. The cause was transferred to Montana and after

extensive discovery, heard before the Eighteenth Judicial District Court in September, 1981. The District Court denied plaintiffs relief, concluding that the defendants had acted in good faith for the benefit of Ski Yellowstone, and committed no fraudulent, oppressive or illegal acts in the course of their management of and membership in that corporation. Plaintiffs appeal.

Because of the complex facts and a number of nondispositive accusations by the plaintiffs, we will consider a number of these accusations first in order to eliminate the same before proceeding to the substantive issues.

Plaintiffs concede that defendant Hall had the legal right to convert his "A" and "B" debentures to stock, and that he had the right to purchase unsubscribed debentures and unsubscribed "C" and "D" stock. All shareholders possessed those rights. No shareholder was required to give warning to others of his intent to convert to common stock or purchase overages.

Plaintiffs' arguments sometimes are misleading in seeking to establish that John Hall and his "allies" had gained control of Ski Yellowstone, and thereafter oppressed the other shareholders. Several of such "allies" were more closely associated with Naylor than with defendant Hall. John Hall did not take control of Ski Yellowstone until October 1976 when he became the majority shareholder. This was several months after the previous majority of shareholders had refused to invest further in Ski Yellowstone and thereby retain their own control. Prior to October, 1976, Hall was just another minority shareholder and director, whose vote did not control, and whose responsibility to

other shareholders was significantly less than that of a majority shareholder.

The record does not establish that Hall's acrimonious exchanges with other shareholders are significant in considering the question of oppression. The District Court found such letters to be "juvenile and unworthy of all letter writers." The exchanges were frequently mutual. The plaintiffs as well as Hall were a sophisticated lot, knowledgeable in their fields, and unlikely to abandon an enterprise to their detriment because of a few caustic exchanges with other shareholders.

Plaintiffs protest the issuance of shares of Ski Yellowstone to a number of stockholders, including the defendants Miller and Morgenthaler, and also Hall's wife, for services to the corporation. Section 35-1-606, MCA, provides that labor or services actually performed may serve as consideration for shares issued and that "in the absence of fraud in the transaction, the judgment of the board of directors or the shareholders, as the case may be, as to the value of consideration received for shares shall be conclusive." We find no evidence of fraud in these transactions. There has been shown no impropriety in the transfer of the stock to these parties. It may be noted that prior to the gaining of control by Hall, the board of directors headed by Naylor had issued stock for services to other parties. Plaintiffs' claim in that regard is without merit.

I

Did John Hall breach a duty to minority stockholders with respect to the "C" and "D" stock issues? This is the

principal issue urged by the plaintiffs. An extensive detailed written prospectus was prepared in connection with both the "C" and "D" stock issues. Each of the prospectuses was well drafted and contained all of the information reasonably necessary on the part of the shareholders in order to evaluate each of the stock issues. Each of the stockholders received copies of the prospectuses and there is no dispute in that regard. It is also important to keep in mind that John Hall was not the controlling stockholder or director or officer until October 1976. Up to that time he was at most one of seven directors and of nineteen individual stockholders plus two corporate stockholders.

Plaintiffs contend that John Hall breached his duties to the minority stockholders by actions designed to alienate them and to facilitate his acquisition of control. We have previously disposed of the acrimonious correspondence as not being significant. The District Court did not find any limitation on the contractual rights of the defendants to convert their shares. No evidence is referred to which raises any question as to the sufficiency of such conversions. We therefore have concluded that the stock conversions by the defendants were proper. The plaintiffs argue that the failure of John Hall to advise other stockholders of his plans to support the "C" issue was misleading. There is no evidence to support that contention. As previously indicated, the primary plaintiffs already had concluded they would not support the "C" issue. We find that all information reasonably needed by the minority stockholders in order that they might conclude whether or not to convert their "A" or "B" debentures, or to purchase "C" or "D" stock issues

-13-

was furnished to them and that there was no breach of duties with regard to the alienation of stockholder interest in the company.

Plaintiffs contend that John Hall breached his fiduciary duties to minority stockholders by purchasing stock in "C" on terms not available to others, and by authorizing the "D" issue when that issue was unnecessary. As mentioned, the prospectus for the "C" issue and for the "D" issue set forth all of the pertinent details needed by the stockholders. The change in the amount of interest to be paid by John Hall will be discussed later.

In connection with the proposed "D" issue, the directors, including John Hall, adopted a two-tier budget. Under this budget, long-term obligations essential to the survival of the company were to be paid out of the proceeds of the "C" issue. The second tier related to items to be paid in order to meet the costs of obtaining the Forest Service permit, and the plan was that such second tier would be paid out of the proceeds of the "D" issue. Plaintiffs argue that the "D" issue would not have been needed if Hall had paid for all of the "C" issue. There is substantial evidence contradicting this assertion in the record.

The District Court found that the actions of the directors and Hall were to be measured by the "business judgment rule." We approve the statement of this rule contained in Nursing Home Building Corp. v. DeHart (1975), 13 Wash.App. 489, 535 P.2d 137, 143-144, as follows:

> ". . . The 'business judgment rule'
> immunizes management from liability in a
> corporate transaction undertaken within
> both the power of the corporation and the
> authority of management where there is a
> reasonable basis to indicate that the

-14-

transaction was made in good faith. An excellent statement of the 'business judgment rule' is found in W. Fletcher §1039 at pages 621-25:

"'It is too well settled to admit of controversy that ordinarily neither the directors nor the other officers of a corporation are liable for mere mistake or errors of judgment, either of law or fact. In other words, directors of a commercial corporation may take chances, the same kind of chances that a man would take in his own business. Because they are given this wide latitude, the law will not hold directors liable for honest errors, for mistakes of judgment, when they act without corrupt motive and in good faith, that is, for mistakes which may properly be classified under the head of honest mistakes. And that is true even though the errors may be so gross that they may demonstrate the unfitness of the directors to manage the corporate affairs. This rule is commonly referred to as the "business judgment rule."'

"(Footnotes omitted.) See also H. Henn, Law of Corporations §242 (1970)."

The actions of the board of directors in this case are to be measured by the business judgment rule. While it is clearly arguable that the two-tier budget might not have been the perfect solution to the financial needs of the corporation, we find ample evidence in the record, as pointed out by the District Court, demonstrating that this financial analysis contained in the two-tier budget was a reasonable theory for the directors and officers to adopt. The record does not show any corrupt or fraudulent motives. Of particular significance is the absence in the record of facts showing an actual mistake of judgment in the adoption of the two-tier budget and the issue of the "D" stock as well as the "C" stock. Following the subscription to the "D" issue, for the first time Ski Yellowstone was in an adequate financial posture to meet current operating expenses

and long-range development expenses. It is interesting to note that the plaintiffs, who concluded that it was bad business judgment on their own part to invest additional funds in this corporation, now contend that the "D" issue was unnecessary and was only a device to obtain control of the corporation. As mentioned previously, the plaintiffs had the option to purchase the stock in the same manner and at the same price and terms as the defendants, and in particular John Hall. As determined by the District Court, the record contains substantial evidence to support the business need for the "D" issue.

We approve the "D" issue following the "C" issue under the business judgment rule, as the plaintiffs have failed to prove any basis for setting the same aside.

Plaintiffs also argue that the reduction in price of the "D" issue from $.05 to $.01 was an improper sale of the stock at less than its value. The record demonstrates that all of the shareholders had the opportunity to purchase the "D" issue at $.05 but failed to do so. The directors then reduced the price from $.05 to $.01 per share, again giving the opportunity to all shareholders to purchase the "D" issue at $.01 per share. Only John Hall and a few other stockholders purchased. The plaintiffs did not choose to do so. Complete information was furnished under the prospectus to all of the stockholders so that no one was misled. Plaintiffs argue that the issue should have been held open at the $.05 price for sixty days as required under the founders' agreement. In the prospectus, all of the stockholders were advised of the thirteen-day period within which a decision was required on the $.05 price, and were also advised that there was a sixty-day provision which might give stockholders an opportunity to purchase at the

$.05 price for a longer period. Having found that no one desired to purchase at $.05, the directors reduced the offering price to $.01 and gave the full sixty-day period within which to purchase at $.01. Again, it is to be noted that the plaintiffs did not attempt to purchase or offer to purchase at the $.01 price. Further, there was substantial evidence to support the conclusion of the District Court that the price of $.01 was the fair market value of the stock. The claim as to the purchase price of the "D" issue is without foundation.

We therefore conclude that there was a legitimate business purpose in the adoption by the board of directors of the two-tier budget, and in the making of the "D" issue, as well as the reduction in the subscription price for the "D" shares from $.05 to $.01. Such actions are approved under the business judgment rule.

The District Court prepared extensive and detailed findings of fact, supported by a memorandum analyzing the facts and rules of law. We will not substitute our judgment for that of the trier of fact. As stated in Jensen v. Jensen (1981), _____ Mont. _____, 629 P.2d 765, 768, 38 St.Rep. 927, 930:

> "This Court will not substitute its judg-
> ment for that of the trier of fact. We
> will consider only whether substantial
> credible evidence supports the findings
> and conclusions. Findings will not be
> overturned unless there is a clear
> preponderance of evidence against them,
> recognizing that evidence may be weak or
> conflicting, yet still support the
> findings. Phennicie v. Phennicie (1979),
> Mont., 604 P.2d 787, 790, 36 St.Rep.
> 2378, 2381. The judgment of the trial
> court is presumed correct, and this Court
> will draw every legitimate inference to
> support that presumption. Marta v. Smith
> (1981), Mont., 622 P.2d 1011, 1015, 38
> St.Rep. 28, 32; Madison Fork Ranch v. L &
> B Lodge, Etc. (1980), Mont., 615 P.2d
> 900, 905-906, 37 St.Rep. 1468, 1473."

On the key questions of the "C" and "D" issues, there

is substantial credible evidence supporting the findings and conclusions of the court. We therefore affirm such conclusions on that basis as well.

Plaintiffs also contend that John Hall breached his fiduciary duties to stockholders when he failed to pay the balance of the purchase price on the series "C" issue in the time required under the prospectus. We find that this failure to pay did deprive the corporation of the purchase price of the stock, as a result of which the corporation suffered a loss equivalent to the income which it would have earned if Hall had paid for the "C" stock on the same basis as that offered to all shareholders. We therefore hold that the District Court shall determine the interest to be paid by John Hall to the corporation, which shall run from the due date for the payment of the balance of the purchase price on the "C" issue as contained in the offering to the date on which it was actually paid.

II

After acquiring control of the corporation, did John Hall engage in a course of conduct which was oppressive to minority stockholders and which justifies liquidation of the corporation? Plaintiffs contend that there is oppression sufficient to qualify for liquidation of the corporation pursuant to section 35-1-921, MCA, which provides in pertinent part:

> "Power of court to liquidate assets and business of corporation -- venue. (1) The district courts shall have full power to liquidate the assets and business of a corporation:
>
> "(a) in an action by a shareholder when it is established that:

-18-

"...

"(ii) the acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent . . ."

We refer to Skierka v. Skierka Bros., Inc. (1981), ____ Mont. ____, 629 P.2d 214, 38 St.Rep. 754, and Fox v. 7L Bar Ranch Co. (1982), ____ Mont. ____, 645 P.2d 929, 39 St.Rep. 862. These cases discuss at length the rationale behind the liquidation of a corporation because of illegal, oppressive or fraudulent acts. In the Skierka case, we quoted from the case of Fix v. Fix Material Co., Inc. (Mo.App. 1976), 538 S.W.2d 351, in which the court makes the following observations particularly applicable here:

"'The Illinois courts made it clear, when construing the Illinois Statute (the Model for § 351.485 [the Missouri statute]), that "oppression" is, in and of itself, an independent ground for relief not requiring a showing of fraud, illegality, mismanagement, wasting of assets, nor deadlock, though these factors are frequently present . . .

"'It has often been stated that oppression suggests . . . "a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely." ". . . Such definitions are suggested perimeters of the broad term rather than narrow definitions which would tend to rob the term of its useful flexibility. As we read the statute, it is intended the courts will proceed on a case-by-case basis."'" Skierka, 629 P.2d at 221, 38 St.Rep. at 764.

It should be noted that both Skierka and Fox involve closely-held family corporations. In contrast, as pointed out by the District Court, the present case involves approximately twenty businessmen with extensive financial and investment backgrounds.

The plaintiffs argue that, after gaining control in

-19-

1976, John Hall ran a one-man show with limited meetings of the executive committee and board of directors. They also argue that the firing of Geier indicated such type of conduct, ignoring the finding by the District Court that Geier had improperly transferred company funds to a private account of his own in order to cover his retirement fund in anticipation of the collapse of the corporation. Reference is also made to the purchase of the property to which Naylor claimed title. That is the subject of the companion case of Naylor v. Hall, previously cited, and is not appropriate here.

The District Court analyzed these facts in detail, and set forth examples in a number of paragraphs in its findings, showing how the conduct of the defendants was proper and for the benefit of the corporation. Ultimately, the District Court concluded:

> "The defendants acted in good faith for the benefit of the corporation, Ski Yellowstone, Inc.
>
> "The defendants committed no fraudulent, oppressive, or illegal acts in the course of their management and membership of and with Ski Yellowstone, Inc."

As previously stated in Jenson, we will consider only whether substantial credible evidence supports the findings and conclusions of the court and the findings will not be overturned unless there is a clear preponderance of evidence against them. We find no basis in fact for an overturning of the findings and conclusions.


III

After acquiring control of the corporation, was John Hall guilty of fraud and self-dealing?

-20-

This contention on the part of the plaintiffs again is based on section 35-1-921, MCA, which is above quoted. The basic controlling rule of law is also quoted in Skierka, above.

Plaintiffs contend that by the postponement of the making of payments on the "C" issue, Hall engaged in inappropriate self-dealing. That issue has been resolved by the interest requirement previously set forth in this opinion. In a similar manner, the contention is made that the improper purchase of the Naylor lot was significant, but that has also been resolved in the case of Naylor v. Hall, above. Plaintiffs additionally refer to a number of relatively insignificant actions by Hall as a basis for self-dealing. These contentions are answered by the findings and conclusions of the District Court described, with which the plaintiffs do not take issue.

Plaintiffs contend that the issuance of corporate credits for services was improper. The District Court found that this action was not improper, and was similar to the actions on the part of some of the plaintiffs when they were in control.

Again, we find that there is substantial credible evidence supporting the findings and conclusions of the District Court that there was neither fraud nor self-dealing on the part of John Hall.

IV

Was the amendment of the corporation's Articles of Incorporation, which authorized stock for the "C" and "D" issues valid under Montana law? Plaintiffs argue that these

-21-

issues must be rolled back because of the failure to give the statutory notice of the stockholders' meeting at which the stockholders approved the amendment of articles to increase the authorized shares. We hold that the plaintiffs are equitably estopped from asserting the invalidity of the amendment.

Section 35-1-207, MCA, as then in effect, provided that thirty days written notice of a shareholders' meeting must be given if the meeting will consider a vote on a proposed amendment of articles to increase shares. Here, notice of shareholders' meeting to be held on July 12, 1976, was given by a letter dated July 1, 1976, which indicates substantially less than the statutory thirty days. The date of the meeting subsequently was changed to July 16, 1976, by an undated subsequent notice. That notice announced that the purpose of the meeting was to amend the Articles of Incorporation in order to draw up the par value and to increase the number of authorized shares from 6,000,000 shares to a number to be determined at the meeting. The significance of the meeting was stressed. The effectiveness of the notice is demonstrated by the vote cast at the meeting where 2,513,000 shares were represented out of a total of 2,614,200 shares outstanding, making over 96 percent of the voting stock present in person or by proxy. The vote at the meeting was unanimous in adopting the recommendation of the directors to amend the Articles to increase the number of shares to 60,000,000 shares and to drop the par value of the shares to $.01. In reliance upon the validity of the amendment, John Hall alone subscribed to a substantial number of Series "C" stock, a subscription

which assured the success of the issue. As indicated by the District Court, this saved the corporation from failure. In addition, John Hall alone subscribed to a substantial portion of the "D" issue after the failure of other shareholders to join in that subscription. Again John Hall's subscription saved the issue from failure. That subscription was clearly a high-risk adventure which funded the second tier of the two-tier budget and assured the future financial viability of the corporation. Now, years later, when the issuance of the Forest Service permit seems assured, and the success of the corporation seems likely, the courts are asked to invalidate the amendment of the corporation Articles and roll back the stock issues. Obviously this is directed almost exclusively at John Hall. The plaintiffs making this request include several of the directors who approved the amendment and particularly Mr. Naylor, who was present and abstained from voting, as well as a large number of the minority shareholders who actually voted their approval of the amendment. All of the plaintiff shareholders have benefited from the purchase by John Hall of the "C" and "D" stock.

The present action is a stockholders' derivative suit which is an invention of the courts of equity and is recognizable only in equity. Noble v. Farmers Union Trading Co. (1950), 123 Mont. 518, 529, 216 P.2d 925, 930. This Court previously has recognized the flexibility required of courts of equity in resolving disputes. See, Skierka and Fox, cited above. We hold that it would be inequitable to allow the plaintiffs to assert the invalidity of the amendment of the Articles because of their involvement and acceptance of benefits.

What relief is appropriate under all the circumstances? Plaintiffs urge us not to view this suit as merely the outcome of a corporate power struggle between Naylor and Hall. The record demonstrates that the root of the conflict was such a power struggle, and that the effect of Hall's actions was less disastrous than had he failed. The record discloses that Hall's actions were taken primarily to preserve and promote Ski Yellowstone, regardless of the very substantial risk to himself. He converted interest-bearing debentures into stock, reducing the financial obligation of the financially-strained corporation, and assumed the risk that the $.20 per share value of the stock would decrease (as it did), and, incidentally, gained more voting power. He twice subscribed to sufficient stock in the company to insure the success of a subscription which was otherwise certain to fail. He legitimately gained ownership of the vast majority of Ski Yellowstone stock.

Naylor, on the other hand, sought to maintain control of Ski Yellowstone by means which placed himself and Ski Roundtop in the most secure financial situation, but threatened the viability of Ski Yellowstone. He originally indicated his willingness to invest $200,000, assuring prospective investors that their $1.00 per share would shortly be worth $10.00, but then only invested $50,000 himself. After his arguments with Hall, he withdrew his support for the "C" Series and persuaded many of his associates to do the same despite the company's dire need for cash. He did not risk converting his own debentures to stock, and invested no more capital in the corporation after

the summer of 1976. Indeed, very few of the minority stock-holders chose to risk further investments in Ski Yellowstone after the "B" debentures. They ventured a total of $10,480 in the "C" offering and less than that in the "D" offering. Plaintiffs' statement that for 37 percent of the investment capital, John Hall obtained over 94 percent of the stock, sounds much less significant when we realize that without the almost $900,000 which Hall invested, the company would have foundered.

The bulk of the evidence supports the conclusion that the shareholders withdrew their support from Ski Yellowstone primarily because of their unwillingness to extend them-selves further in a risky investment. We have found there was sufficient evidence to support the trial court's conclu-sion that the "D" issue provided funding for the second tier of the budget and that the reduction in the price of the "D" shares from $.05 to $.01 was not unreasonable or improper.

We agree with the District Court's conclusion that the bottom line is really that plaintiffs chose not to partici-pate and not to invest further in the Ski Yellowstone venture, and the remedies sought against the defendants are not warranted. We conclude that the record adequately supports the trial court's findings that the defendants' actions, while not totally blameless, were neither fraudu-lent, oppressive, nor illegal, but were taken in good faith for the benefit of the corporation.

Therefore, except for our finding that John Hall is liable to Ski Yellowstone for interest arising from his delayed payments on the "C" Series subscription, we affirm the District Court in all respects. We remand the cause to

-25-

the District Court for a determination of the amount of the interest due from Mr. Hall.

_____
                Justice

We concur:

_____
            Chief Justice

_____


_____


_____
                Justices

_____
Honorable Peter G. Meloy,
District Judge, sitting in
place of Mr. Justice Gene B.
Daly

Mr. Justice Frank B. Morrison, Jr., dissenting:

I respectfully dissent:

Both the District Court and the majority of this Court defeated the claim of minority shareholders because the actions of John Hall salvaged Ski Yellowstone from the throes of financial ruin. Whether John Hall saved the "corporate bacon" is not the issue in this case.

In determining whether the "D" stock issue was proper, the majority rely upon the "business judgment" rule. The "business judgment" rule is not applicable to this case. However, this Court's reliance upon the rule indicates that the majority simply did not understand the essence of plaintiff's constructive fraud allegation.

The "business judgment" rule is employed to immunize corporate officers and directors where they act in good faith, but, as a matter of hindsight, it can be determined that they did not take the course of action which hindsight shows to have been the best selection. The rule simply has no application in this case. Here we must determine whether the desired corporate objective of obtaining much needed revenue could have been achieved without "watering" the stock of minority shareholders. If the revenue could have been raised without diluting their interests, then the means Hall employed constituted a "constructive fraud" within the meaning of Montana law.

John Hall decided to pay for his subscribed stock under the "C" issue through a deferred payment plan instead of paying cash as he was supposed to do under the original offering. This was justified by reliance on a two-tier budget. Hall claimed it was unnecessary to pay cash for the stock as there were not sufficient immediate cash needs of the corporation to require a cash subscription. Then, without first paying for the "C" issue, Hall caused a "D"

issue.  As I hereafter point out, this was a constructive fraud.

To compound the constructive fraud committed in the issuance of the "D" stock, Hall and his board of directors further diluted the interest of the minority shareholders by replacing the original five cent "D" issue with penny stock. Of course, this maneuver did not enable the corporation to raise more money, it simply gave Hall more shares of stock. The corporate interest was not being further enhanced by Hall's maneuvering; rather, the minority stockholders' interests were being further "watered."  This again constituted a constructive fraud.

Corporate directors, in issuing additional shares of stock, owe a fiduciary duty to minority stockholders.  See Condec Corporation v. Lunkenheimer Company (Del. 1967), 230 Atl.2d 769.  Where a fiduciary relationship adheres, the law of "constructive fraud" controls.  Constructive fraud involves "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice . . ."  Section 28-2-406(1), MCA.  Where a fiduciary duty is involved, the trustee is bound to act in the highest good faith.  Section 72-20-201, MCA.  If a transaction is challenged, the burden is upon a corporate officer or a corporate director to prove that the questioned actions were fair and in good faith.  First State Bank of Hilger v. Lang (1918), 55 Mont. 146, 174 Pac. 597.

It is clear from the evidence in this record that the financing technology employed by Hall benefited Hall at the expense of minority shareholders.  Of course, it is no defense to argue that Hall benefited the corporation because the same corporate funds could have been realized without unnecessarily diluting the interests of minority shareholders.

-28-

The majority seems to grasp at defendants' argument that minority shareholders were offered the same price Hall paid for all stock issues. This rationale makes very bad corporate law and greatly erodes the protection previously afforded those benefiting from a fiduciary relationship. Under the law articulated in the majority opinion, minority shareholders can now be coerced into purchasing additional shares in a corporation in which they will have no voice. Further, unless the minority shareholders are willing to participate under such adverse circumstances, they will be denied standing to claim a breach of the fiduciary duty owed. If they have no money to invest in additional shares, they will be totally helpless.

There is an old adage that "bad facts make bad law." I can think of no better example than this case. The majority is rewarding John Hall for rescuing Ski Yellowstone when it was at the verge of bankruptcy. I certainly understand the equity in that position. However, in doing so, the majority has emasculated the law of constructive fraud.

In enacting the laws on constructive fraud, the legislature sought to prevent the weak from becoming prey of the strong. The statutory law of this State which sought to advance the legislature's laudable objective gained added significance with its application in Skierka v. Skierka Brothers, Inc. (1981), ____Mont.____, 629 P.2d 214, 38 St.Rep. 754. I can only conclude from the majority decision in this case, that the law of constructive fraud as it exists in Montana will be applied on an ad hoc basis.

I wish to point out to those who attempt to rely upon this case in the future, that it is nothing but an "aberration" in the law. Misplaced reliance on the "business judgment" rule and refusal to apply the law of constructive fraud

resulted from the facts which were here at issue. John Hall saved this corporation from bankruptcy. All of the investors in this case were highly-experienced business persons. Hall carefully made all investment opportunities available to those with whom he occupied a position of trust. These factors have permitted him to prevail here, notwithstanding clear legal principles which should mandate plaintiff's success.

I would roll back the "D" issue as a matter of law because under the undisputed evidence in the record, the issue caused a constructive fraud on minority shareholders.

_____
Justice Frank B. Morrison, Jr.

Mr. Justice John C. Sheehy, dissenting:

I join in the dissent of Mr. Justice Morrison.

_____
Justice