JUSTICE WARNER
delivered the Opinion of the Court.
¶1 Lisa R.B. Bovey appeals from a judgment entered in the Eighth Judicial District Court, Cascade County, distributing residue of the Sue Bovey Testamentary Trust to Thomas Couch, Patsy Allen, Connie Sisko, Robert Ford Faegre, Shirley Page Faegre, Judy Bistodeau, and Mary W. F. Putnam (hereinafter referred to jointly as “Respondents”).[1] We affirm.
¶2 Sue Ford Bovey (Sue) died on October 7,1988; she was survived by her son, Ford Bovey (Ford). Sue executed a will in 1984, which created a trust for Ford. The residuary clause of the trust reads as follows:
Upon the death of my son, Ford, this trust shall terminate and all of the then remaining accrued and unpaid income and all of the then remaining principal of this trust shall be distributed, outright, and free of trust, in equal shares, to my then living heirs-at-law.
*256 ¶3 In August of 1993, Ford adopted Lisa Bovey (Lisa), the appellant and daughter of his ex-wife. Lisa was twenty-five years old at the time of the adoption. Ford had no natural children. He died in December 1999.
¶4 Lisa first became acquainted with Ford when her mother, Sharon McGregor (Sharon), began dating Ford in 1979. In 1982, Lisa, her brother, and her mother moved into Ford’s home, in Virginia City, Montana. Lisa was approximately thirteen years old at this time. While living with Ford, Lisa’s mother worked full-time for one of Ford’s businesses, and was therefore away from the home much of the time. Lisa’s relationship with her mother was tumultuous during this period. In addition, the District Court found that Ford was a heavy drinker and also used, at least from time to time, various illicit drugs including cocaine, opium, heroin, LSD and amphetamines. Lisa’s mother testified that Ford’s drinking was “really bad” at this time.
¶5 Ford financially supported Lisa during the short period she lived in his house. However, the living situation was far from ideal for a child and was a significant contribution to Lisa’s problems. In December of 1984, after living in Ford’s home for about two years, Lisa was removed from Ford’s home and placed in foster care by the Department of Family Services. On June 3, 1985, she returned to Ford’s home, where her mother still resided, but ran away sixteen days later, and was returned to foster care. Lisa never returned to Ford’s home during her minority. These foster care placements were made by formal court order. The placement order of July 9, 1985, found that continuing to reside in Ford’s home would be detrimental to Lisa’s welfare, and that she was not under the care and supervision of a suitable adult and had no proper guidance to provide for her physical, moral and emotional well-being. Lisa remained in foster care until she graduated from high school approximately one year later in 1986. Lisa turned eighteen on April 18, 1986. She joined the Navy in the fall of 1988.
¶6 Ford and Lisa’s mother married in July 1986, after Lisa had reached the age of majority. However, Lisa’s mother filed for divorce in 1989 and she and Ford were ultimately divorced in 1997.
¶7 During the 1982-84 period Ford introduced Lisa at times as his daughter and apparently mentioned adoption at times, but took no action in that regard. The District Court found there was no other evidence of Ford’s intent to adopt Lisa until after Sue’s death, in October of 1988. Years later, by 1993 when the adoption took place, Ford appeared to have developed a certain fondness for Lisa. This affection was demonstrated by Ford’s asking Lisa to come to Arizona, *257 where he lived at the time, to help attend to him after open-heart surgery. Ford also voiced affection for Lisa in statements made to the adoption attorney.
¶8 However, after Sue’s Death, Ford repeatedly told trust officer, Tom Ellis, that he intended to adopt someone for the purpose of exercising control over the residue of the trust. He mentioned friends and Sharon’s children for this purpose and may have specifically mentioned Lisa in this context. He also told a close family friend of Sue’s that he had adopted Lisa so the Sim River relatives (Couches) would not get his mother’s property when he died.
¶9 This Court reviews the findings of a trial court sitting without a jury to determine if the court’s findings are clearly erroneous. Tomlin Enterprises, Inc. v. Althoff, 2004 MT 383, ¶ 12, 325 Mont. 99, ¶ 12, 103 P.3d 1069, ¶ 12. A district court’s findings are clearly erroneous if they are not supported by substantial creditable evidence, if the trial court has misapprehended the effect of evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. Albert v. Hastetter, 2002 MT 123, ¶ 14, 310 Mont. 82, ¶ 14, 48 P.3d 749, ¶ 14. Additionally, in determining whether the trial court’s findings are supported by substantial creditable evidence, this Court must view the evidence in the light most favorable to the prevailing party. Albert, ¶ 14. We review a district court’s conclusions of law to determine whether those conclusions were correct. Albert, ¶ 14. We will affirm a correct result regardless of the reasoning used by the lower court. Higham v. City of Red Lodge (1991), 247 Mont. 400, 402, 807 P.2d 195, 196.
¶10 Lisa argues that because she was adopted by Ford she is a descendant of Sue, by representation, under § 72-2-113(l)(a),[2] MCA, and should therefore inherent the residue of the trust as she is Sue’s only living heir-at-law. Thus, she is to take the remainder of the trust under Sue’s will. However, the District Court concluded that because Lisa was not, while a minor, a regular member of Ford’s household, as required by § 72-2-715, MCA, she was not entitled to the remainder of Ford’s trust.
¶11 As a preliminary matter, Respondents moved to strike Lisa’s arguments in her reply brief that § 72-2-715, MCA, is not applicable here as it was not enacted at the time Sue executed her will, or at the *258 time of her death. Rule 23(c), M.R.App.P., provides that an appellant’s reply brief must be confined to new matter raised in the respondent’s brief; thus, an appellant may not raise new issues in a reply brief. We will not address the merits of an issue presented for the first time in a reply brief. Pengra v. State, 2000 MT 291, ¶ 13, 202 Mont. 276, ¶ 13, 14 P.3d 499, ¶ 13. Nor will we address on appeal an argument not raised in the District Court. In re Lewis, 2004 MT 160, ¶ 19, 322 Mont. 13, ¶ 19, 92 P.3d 1218, ¶ 19. Therefore, Respondents’ motion to strike is granted.
¶12 For an adopted individual to be eligible to take by intestate succession, where the decedent was not the adopting parent, she must meet the requirements of § 72-2-715(3), MCA. The relevant portion states:
[I]n construing a dispositive provision of a transferor who is not the adopting parent, an adopted individual is not considered the child of the adopting parent unless the adopted individual lived while a minor, either before or after the adoption, as a regular member of the household of the adopting parent.
Section 72-2-715(3), MCA. This Court has not had the opportunity to address this provision of Montana’s version of the Uniform Probate Code.
¶13 The rationale for § 72-2-715(3), MCA, is set forth in the official comment to the section:
The general theory of [§ 72-2-715(3)] is that a transferor who is not the adopting parent of an adopted child would want the child to be included in a class gift as a child of the adopting parent only if the child lived while a minor, either before or after the adoption, as a regular member of the household of that adopting parent.
The District Court concluded from this language that the intent of the testator was relevant in its determination of whether the adopted child was a regular member of the adopting parent’s household. Thus, here, the District Court considered Sue’s intent relevant to whether Lisa was a regular member of Ford’s household. This is incorrect. By definition, the law of intestate succession determines the intent of the testator. Where it is determined that the child was a regular member of the household of the adopting parent, the legislature has declared that the testator intended for that child to be included in a class gift for children of the adopting parent. Section 72-2-715(3). Therefore, the law supplies the intent of the testator, here Sue, and the court’s only function is to determine the factual issue of whether Lisa, while a minor, was a regular member of Ford’s household. We must then determine what the legislature meant in saying the adoptee is *259 required to be a “regular member of the household of the adopting parent.”
¶14 Section 72-2-715(3), MCA, is based on California Probate Code § 21115(b) (formally Cal. Prob. Code § 6152). Section 72-2-715(3), MCA, official cmt. Therefore, the commission comments to the California Code, and the policy noted in several California cases are helpful in our determination.
¶15 The commission comment to Cal. Prob. Code § 21115 states, “Subdivision (b) [the equivalent of Subsection 72-2-715(3), MCA] precludes the adoption of a person (often an adult) solely for the purpose of permitting the adoptee to take under the testamentary instrument of another.” This policy has been followed by the California courts. In Estate of DeLoreto (2004), 118 Cal.App.4th 1048, the appellate court held that two adopted adult children, while minors, were not “regular members” of the adopting parent’s household, under Cal. Prob. Code § 21115(b). DeLoreto, 118 Cal. App.4th at 1052-1053. The DeLoreto court stated that the statute should be strictly construed so as to discourage “adoptions made for the purpose of becoming beneficiaries of the estates of unsuspecting testators.” DeLoreto, 118 Cal.App.4th at 1054.[3]
¶16 The same policy was recognized in Pittman v. Goris (1980), 104 Cal.App.3d 288, where the court dealt with a similar situation prior to California’s codification of its present statute. In Pittman, the court stated that generally children who are adopted as adults should be excluded from class designations of “children” or “children of children.” Pittman, 104 Cal.App.3d at 294. However, an exception should be recognized as to “adult adoptees who had actually been taken into the adoptive parent’s home and family as minors and who were reared by the adoptive parent....” Pittman, 104 Cal.App.3d at 295. The Pittman Court further reasoned that adult adoptees coming within the exception should be deemed to fall within the class “unless it is shown that the purpose of the adoption was to diminish or defeat the income and remainder interests of other beneficiaries ‘for purposes of financial gain or as a spite device.’ ” Pittman, 104 Cal.App.3d at 295 (quoting Oler, Construction of Private Instruments Where Adopted Children Are Concerned (1945), 43 Mich.L.Rev. 901, 938).
¶17 We conclude that being a regular member of the household of the adopting parent requires more than simple residence for a time at *260 the adopting parent’s home. The underlying policy of subsection (3) is to limit the ability of the adopting parent to circumvent the testamentary intent of another. It is less likely that the individual was adopted as a means of circumventing the intent of the testator if the adopted individual, while a minor, had some familial relationship with the adopting parent. Or, as the California court articulated it, the adoptee should have been “taken into the adoptive parent’s home and family as [a] minor[] and... reared by the adoptive parent[.]” Pittman, 104 Cal.App.3d at 295. This is further supported by the statute’s use of the terms “member” and “household,” and not simply “residence” or “reside.” This language evidences the legislature’s intent that the relationship between the two parties constitutes something beyond that of simple residence.[4]
¶18 In this case, the District Court found no such relationship between Ford and Lisa while she was a minor. Specifically, the District Court found that:
[Lisa”s] stay in Ford’s house was relatively short-about two years. Lisa was already a teenager. It can hardly be said that [Ford] “reared” her. It appears he seldom was in the house during his waking hours. Ford and Sharon [Lisa’s mother] were not married at the time. Lisa was only there because her mother was there. When that relationship [with her mother] broke down, she left. Whatever the relationship between [Lisa] and Ford might have been, nothing about it deterred Lisa’s departure. In fact, what she was hearing about him and possibly his drinking contributed to her wanting out. During her stay with him, she had three suicide attempts. She was ultimately adjudicated a dependant youth-“that she has no proper guidance to provide for her necessary physical, moral, and emotional well being[.]” ...
*261 It cannot be said that Ford stood in the relationship with Lisa of “in loco parentis.” [quoting Pittman, 104 Cal.App.3rd at 295].[5]
The record supports the District Court’s finding of fact that no relationship existed between Ford and Lisa during her minority sufficient to indicate she was a regular member of Ford’s household as required by § 72-2-715(3), MCA.
¶19 In addition, given the underlying policy of § 72-2-715, MCA, a finding that the purpose of the adoption was to diminish or defeat the income and remainder interests of other beneficiaries for purposes of financial gain or as a spite device, should be considered in our determination. See § 72-2-715, MCA; see also DeLoreto, 118 Cal.App.4th at 1054 (“strict application of § 21115 will not discourage adoptions consummated for the proper reasons of love and respect... [i]t will only discourage adoptions made for the purpose of becoming beneficiaries of the estates of unsuspecting testators.”). After hearing the witnesses and considering all the evidence, the District Court determined:
That Ford had a motive of defeating the inheritance by blood relatives and substituting himself as the one to determine where the [residue] would go, is abundantly clear. Though able, he did not adopt Lisa while she lived in his home or at the crucial time when the youth in need of care proceedings were going on and she needed a parent. He didn’t adopt her at the time of his marriage to Sharon. He had many conversations with trust officer Ellis about controlling the residue by adoption and who he might adopt. It appears that he may have considered a variety of potential candidates.... He did not adopt Sharon’s other children though it is typical for a stepparent to adopt all of the children of his spouse. ... [W]ithout the trust, there would have been no adoption.
In effect, Ford attempted to exercise a power of appointment that was never granted to him by Sue.
¶20 There is substantial evidence in the record to support the findings of the District Court. Any evidence surrounding Lisa’s stay with her mother at Ford’s residence, and any incidental relationship that may have existed, is outweighed by the lack of any familial *262 relationship between the two while Lisa was a minor, and because Ford’s true intent in the adoption to circumvent Sue’s will. Based on these findings, for the reasons stated above, we conclude that as a matter of law Lisa was not, while a minor, a regular member of Ford’s household. Thus, pursuant to § 72-2-715(3), MCA, Lisa is not considered an heir at law of Sue Bovey.
¶21 The judgment of the District Court is affirmed.
JUSTICES LEAPHART, COTTER and MORRIS concur.

 The Respondents are first cousins once removed from Sue Bovey.

 Section. 72-2-113, MCA, states, in part: “(1) ... the entire intestate estate ... passes in the following order to the individuals designated below who survive the decedent: (a) to the decedent’s descendants by representation[J”

 We cite to this case for its policy only, as we recognize that the facts of the case are distinguishable from those here.

 The notion that being a regular member of the household, under § 72-2-715, MCA, requires more than mere residence at the adoptive parent’s home, is further evidenced by the commission comment to the California code. The comment states that the statute is included to “preclude the adoption of a person (often an adult) solely for the purpose of permitting the adoptee to take under the will of another.” Cal. Prob. Code § 21115, commission cmt. (emphasis added). The parenthetical language indicates that the statute also applies to situations where a minor may be adopted solely for the purpose of permitting the minor to take under the will of another. It would be irrational to assume that in such a situation a court may rely solely on that fact that the minor stayed for a time at the adoptive parent’s home to conclude the minor was a regular member of the household, under § 72-2-715, MCA. Under this rationale the reasons for the minor’s presence would be entirely irrelevant. Such was not the intent of the legislature. The court must be permitted to examine the relationship between the two parties and conclude whether such relationship was conducive to that required under the statute, that of a household, a familial relationship.

 Poor parenting, complicated by drug and alcohol abuse, would not necessarily eliminate a child’s eligibility as a regular member of the household of an individual who later wishes to adopt the child. However, where such problems virtually bar any relationship with the child, as is the case here, such are valid considerations in assessing whether the adoptee was a regular member of the household.