No. 88-627

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

DOUGLAS E. DANIELS,

       Plaintiff and Respondent,

   -vs-

THOMAS, DEAN & HOSKINS, INC.,
a corporation, THOMAS and DEAN
PROPERTIES, INC., a corporation,
T.H. THOMAS, an individual and
as President and Director,

       Defendants and Appellants.

FILED

DEC 21 1990

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Eighth Judicial District,
               In and for the County of Cascade,
               The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

      For Appellants:

         William Conklin, Conklin, Nybo and LeVeque, P.C.,
         Great Falls, Montana

      For Respondent:

         Joe Bottomly, Bottomly Law Offices, Great Falls,
         Montana
         Monte Beck, Beck Law Offices, Bozeman, Montana

Submitted:  March 22, 1990

Decided:  December 21, 1990

Filed:

Clerk

Justice Diane G. Barz delivered the Opinion of the Court.

The District Court of the Eighth Judicial District, Cascade County, Judge Joel G. Roth presiding without a jury, concluded that Daniels, a minority shareholder in T & D Properties, was entitled to $53,128 for his shares in T & D Properties. The District Court based this conclusion on breach of fiduciary duty, oppressive negotiation tactics, constructive fraud, and the presence of a contract between Daniels and Thomas in which Thomas allegedly promised to pay Daniels fair market value for his shares in T & D Properties. The court then granted Daniels his costs in this matter, which included his costs of hiring an appraiser. The court, however, did not find a contractual or statutory right which would allow Daniels to recover his attorney's fees. Defendants appeal. We reverse.

The following issues are raised on appeal:

1. Whether the filing of Daniels' motion for substitution of judge divested Judge Roth of the power to render a judgment on this matter.

2. Whether the District Court erred in ruling that a contract existed which required T & D Properties to purchase Daniels' shares in T & D Properties.

3. Whether the District Court erred in ruling that Daniels was entitled under Montana law to have his shares in T & D Properties appraised and purchased.

4. Whether the pleadings fairly apprised the defendants of the nature of the claims against them.

2

5. Whether the judgment rendered by the District Court properly lies against all three defendants, TD & H, a corporation, T.H. Thomas, an individual, and T & D Properties, a corporation.

6. Whether the District Court erred in awarding Daniels his appraisal fees.

7. Whether the restrictive covenant in the TD & H buy-sell agreement is void under § 28-2-703, MCA.

On cross-appeal, Daniels raises the following issue:

Whether the District Court erred by not awarding Daniels his attorney's fees.

Thomas, Dean & Hoskins, Inc. (TD & H), a defendant, is an engineering firm founded in 1965. TD & H's principal place of business is in Great Falls with branch offices in Kalispell and Bozeman. Thomas & Dean Properties, Inc. (T & D Properties), also a defendant in this lawsuit, is a separate corporation from TD & H. T & D Properties was formed in 1970 for the purpose of developing real estate and for the purpose of holding real and personal property. This property is then leased to TD & H. T & D Properties has never paid dividends, but instead pays "management fees" to TD & H. These fees are then generally distributed as bonuses to TD & H's employees and shareholders. T.H. Thomas, another defendant, is the president and a director of both TD & H and T & D Properties and also a major shareholder in both of these corporations.

Douglas E. Daniels, the plaintiff, is a civil engineer who began working for TD & H in 1969. In 1976, Daniels began purchasing stock in TD & H. TD & H employees who purchased stock

3

in TD & H were also initially expected to purchase an identical proportion of stocks in T & D Properties, however, the TD & H shareholder agreement that was signed in 1979 abolished this requirement. The shareholder agreement also contained a buy-sell agreement for TD & H stock upon the voluntary or involuntary termination from TD & H. The agreement established a formula price for the purchase of the TD & H stocks, a time period in which they will be paid, and a restrictive covenant. No buy-sell agreement was established for the T & D Properties stock.

In 1985, Daniels was living in Bozeman and managing TD & H's branch office in Bozeman. Upon Dean's retirement from TD & H in 1986, Thomas requested that Daniels move to Great Falls to manage the Great Falls office. Daniels had just built a home in Bozeman and therefore requested that alternatives to his moving to Great Falls be considered. In mid-February 1986, Thomas and Daniels met to discuss possible alternatives. The parties agreed to a three-month trial period beginning February 18, 1986, whereby Daniels lived in Bozeman and commuted to Great Falls.

On April 16, 1986, two months after the three-month trial period began, Thomas and Daniels met again at Thomas' request to review the situation. The meeting did not go well. Daniels then suggested that they discuss a termination agreement and Thomas agreed to prepare a proposed termination agreement.

The termination agreement was drafted by an attorney for TD & H and mailed to Daniels on April 18, 1986. Besides providing for the termination of Daniels' employment with TD & H, the termination agreement also provided for the purchase of Daniels'

4

T & D Properties stock. A disagreement arose over the valuation of Daniels' T & D Properties stock. Daniels therefore did not sign the agreement. On May 13, 1986, Daniels and Thomas met and attempted to negotiate the value of the T & D Properties stock, but without success.

On September 17, 1986, in response to a letter written by Daniels, Thomas offered to settle the dispute through negotiations with Jack Holland, an employee of TD & H. On September 24, 1986, Daniels was advised that Jack Holland had been authorized by each corporation to settle Daniels' claims against the corporations with Daniels separately. Holland met with Daniels for two days in September but the negotiations were unsuccessful.

The relationship between Daniels and Thomas continued to deteriorate and on March 27, 1987, Daniels filed a complaint in the District Court of the Eighth Judicial District, Cascade County, alleging bad faith and wrongful termination against TD & H and fraud, breach of fiduciary duty, undue influence, and negligent misrepresentation against Thomas and both corporations. Along with the complaint, Daniels filed a motion for substitution of judge. The case was never transferred to another judge. Just prior to the trial, on June 10, 1988, Judge Roth brought the parties' attention to the motion. At that time, the parties' attorneys stipulated that Judge Roth may sit as trial judge in the case.

This case was bifurcated into two separate actions over vigorous objection by defendants. The action involving legal claims of wrongful termination and breach of good faith and fair dealing in an employment situation was postponed until a later date

for a jury. The action in equity involving whether Daniels was entitled to an appraisal remedy in regard to his T & D Properties stock was then tried without a jury on July 6, 7 and 8, 1988. The trial was recessed until August 15, 1988 when testimony was completed. Earlier, on July 5, 1988, the District Court had granted Daniels' motion for partial summary judgment, ordering that the restrictive covenant found in the 1979 shareholder agreement was an unreasonable burden on the employee and ordered the provision void under § 28-2-703, MCA.

The District Court rendered its judgment on September 14, 1988, concluding that T & D Properties entered into an enforceable contract to pay Daniels, a minority shareholder, for his T & D Properties stock; that Thomas, as president of both TD & H and T & D Properties violated his fiduciary duty by inducing Daniels to leave his employment and by his adversarial negotiation stance; that Daniels, as a minority shareholder, demonstrated an equitable right to have his stocks in T & D Properties appraised and purchased by T & D Properties because of Thomas' oppressive negotiation tactics; and that Thomas' attempts to gain an unfair advantage over Daniels amounted to constructive fraud under Montana law. The court then concluded that the valuation method used by T & D Properties was unfair and therefore adopted the net asset approach as a reasonable method for determining the value of the corporate stock owned by a minority shareholder. The court ordered that under this method Daniels' T & D Properties stocks were worth $53,128. The court also concluded that Daniels was entitled to his costs in this matter, which included his cost of hiring an

6

appraiser. The court, however, also concluded that no contractual or statutory right existed for Daniels to recover his attorney's fees from the defendants. Defendants appeal, and plaintiff cross-appeals, raising the following issues.

The first issue this Court will address on appeal is whether the filing of Daniels' motion for substitution of judge divested Judge Roth of the power to render a judgment on this matter.

Defendants cite § 3-1-804, MCA (1987), to argue that Daniels' filing of the motion for substitution of judge divested Judge Roth of the power to decide the case. This statute states in pertinent part that:

> After a timely motion has been filed, the substituted judge shall have no power to act on the merits of the cause and shall call in another judge.

Section 3-1-804(1)(a), MCA (1987). However, Daniels' motion for substitution of judge was filed on March 27, 1987. The law in effect on that date provided in pertinent part that:

> A motion for substitution of a judge shall be made by filing a written motion for substitution reading as follows:
> "The undersigned hereby moves for substitution of another judge for Judge _____ in this cause." The clerk of court shall immediately give notice thereof to all parties and to the judge named in the motion. Upon filing this notice, the judge named in the motion shall have no further power to act in the cause other than to call in another judge, which he shall do forthwith, and to set the calendar.

Section 3-1-802, MCA (1985). The record indicates that the clerk of court did not give notice to either the judge or the opposing parties nor was a notice of this substitution filed as required by

7

§ 3-1-802, MCA (1985). Because the requirements of the 1985 statute were not followed, Judge Roth retained jurisdiction of the case.

We also note, however, that contrary to what Daniels attempts to assert, a judge could not obtain jurisdiction through the consent of the parties in this case. See, e.g., Corban v. Corban (1972), 161 Mont. 93, 96, 504 P.2d 985, 987; In re Woodside-Florence Irrigation Dist. (1948), 121 Mont. 346, 352, 194 P.2d 241, 244. The parties' stipulation was therefore not effective in allowing Judge Roth to retain jurisdiction of the case. If the motion was filed only three months later, the pertinent law in effect would have been the 1987 statute, and Judge Roth would not have retained jurisdiction of the case. However, in light of the unique set of facts in this case Judge Roth did retain jurisdiction.

The second issue raised on appeal is whether the District Court erred in ruling that a contract existed which required T & D Properties to purchase Daniels' shares in T & D Properties.

In spite of the absence of a written agreement, the District Court concluded that T & D Properties entered into an enforceable contract to pay Daniels for his stock in T & D Properties. The court stated that Thomas' testimony at trial indicated that he promised to pay fair market value for Daniels' stock. The testimony the District Court apparently relied upon to find a contract between Daniels and Thomas stated that:

> Q: (By Mr. Lynch) What promise was made to him about purchasing the stock at the fair market value?

8

> A: We said that we would be willing to negotiate that separate from T, D & H to negotiate a reasonable settlement and that we would be willing to prepare--pay fair market value, and with that the way it had to be an agreement that was made that he was willing to take it, _and we made no guarantee we would reach an agreement with him_ or pay him whatever [he] wanted. (Emphasis added.)

The District Court also justified its position by stating that this Court indicated that the district courts are to look beyond the statutory criteria and "into the equities of the situation" (citing Maddox v. Norman (1983), 206 Mont. 1, 11, 669 P.2d 230, 235).

All contracts must contain four essential elements. These elements are: (1) identifiable parties capable of contracting, (2) the parties' consent, (3) a lawful object, and (4) consideration. Section 28-2-102, MCA; Modern Machinery v. Flathead County (1982), 202 Mont. 140, 144, 656 P.2d 206, 209. In the present case, the purported contract fails for a lack of consent. To have consent, there must be both an offer and an acceptance of that offer. Modern Machinery, 202 Mont. at 144, 656 P.2d at 209. Thomas' testimony that the District Court apparently relied upon to conclude that an agreement existed between Daniels and Thomas for the purchase of Daniels' stock in T & D Properties was not sufficient to establish that Thomas made an offer to Daniels for the stock. In addition, no evidence exists that Daniels ever accepted any offer that was purportedly made by Thomas.

The Restatement (Second) of Contracts, § 24 defines an offer as:

9

[t]he manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.

In the present case, Thomas' testimony does not rise to the level of an offer. Although Thomas did testify that he would be willing to pay fair market value for Daniels' stock in T & D Properties, Thomas also clearly stated that "we would be willing to negotiate . . . a reasonable settlement" and that "we made no guarantee we would reach an agreement with him or pay him whatever [he] wanted."

Thomas' testimony on which the District Court relied upon is merely evidence of the negotiations that occurred between Thomas and Daniels and not an offer made by Thomas. The District Court had previously recognized that no agreement existed when it denied defendants' motion for directed verdict, stating that "[t]here was a promise made to pay fair market value of the T & D [Properties] stock and the parties have been negotiating but have never reached an agreement and they are at a definite impasse." In addition, the District Court's reliance upon Maddox to justify ignoring the statutory criteria and to look into the equities of the situation is not appropriate under these set of facts. As this Court has previously stated "[e]quity can enforce provisions of contracts but it cannot supply them." Myhre v. Myhre (1976), 170 Mont. 410, 424, 554 P.2d 276, 283. Thomas' testimony does not contain language that rises to an offer and therefore equity cannot be relied upon to create an offer.

The third issue that will be addressed on appeal is whether the District Court erred in ruling that Daniels was entitled under

10

Montana law to have his stock in T & D Properties appraised and purchased.

T & D Properties is a closely held corporation but has not elected to become a statutory close corporation under the Montana Close Corporation Act, § 35-9-101 et seq., MCA. Therefore, Daniels' claims are governed by the provisions of the Montana Business Corporation Act, § 35-1-101 et seq., MCA. The District Court concluded that Daniels was entitled to $53,128 for his three and one-half shares of T & D Properties. The court based its conclusion on findings of a breach of a fiduciary duty, oppression of a minority shareholder and constructive fraud. In light of these findings, the District Court apparently concluded that under §§ 35-1-810, 35-1-921, MCA, and case law that it was empowered to appraise the stock of a minority shareholder and order T & D Properties to purchase Daniels' stock in T & D Properties for the sum of $53,128.

The proceedings in the District Court were of a broad equitable nature. Furthermore, many issues raised on appeal are mixed questions of law and fact. This Court's duty upon review of equity cases and proceedings of an equitable nature is to review all questions of fact arising upon the evidence presented in the record, whether the evidence is alleged to be insufficient or not, and to determine the same, as well as questions of law. Section 3-2-204(5), MCA. "There is in that statutory requirement for our appellate review a measure of protection for the losing party coming to us on appeal, at least in equity cases such as this." Sawyer-Adecor Int'l, Inc. v. Anglin (1982), 198 Mont. 440, 447, 646 P.2d 1194, 1198. We recognize that Rule 52(a), M.R.Civ.P. requires findings of fact made by the district court to be upheld unless they are clearly erroneous and that Rule 52(a) does not make any distinction between cases of an equitable nature and cases at law. However, this Court has stated that we will review both questions of law and questions of fact but will not reverse the trial court in an equity case on questions of fact unless there is a decided preponderance of the evidence against those findings.

11

<u>Sawyer-Adecor</u>, 646 P.2d at 1199; <u>Boz-Lew Builders v. Smith</u> (1977), 174 Mont. 448, 452, 571 P.2d 389, 391. After reviewing the record we hold there is a preponderance of the evidence in the record against the findings of the District Court.

## A. Dissenter's Rights

The District Court found that one of the bases of Daniels' right to an appraisal was a corporate resolution to pay Daniels for his shares, thus, triggering the following provision:

> Any shareholder of a corporation shall have the right to dissent from and to obtain payment for his shares in the event of any of the following corporate actions:
>
> . . .
>
> (e) any other corporate action taken pursuant to a shareholder vote with respect to which the . . . resolution of the board of directors directs that dissenting shareholders have a right to obtain payment of their shares.

Section 35-1-810(1)(e), MCA.

The District Court's ruling is unsupported by the evidence presented. No such corporate resolution was entered into the record. Thomas testified that he was authorized to offer up to $35,000 for Daniels' stock, but there was no testimony that Thomas was directed to purchase the stock. Exhibit 19c is a stockholder letter dated September 24, 1986, authorizing Jack Holland, an employee of TD & H, to settle any and all claims against T & D Properties. It is not a board resolution directing purchase of Daniels' stock. Moreover, the requirements of § 35-1-810(e), MCA, were not satisfied. This section clearly contemplates corporate action pursuant to a shareholder vote from which a shareholder

12

dissents, followed by a resolution of the board of directors directing that such dissenter has a right to withdraw his investment and obtain payment for his shares. That is not what occurred in this case.

## B. Fiduciary Duty

In the present case, Thomas' actions do not rise--either statutorily or in equity--to the level in which a court should interfere with a close corporation's business affairs. In its conclusions of law, the District Court first found that Thomas had breached his fiduciary duty to Daniels. In particular, the court found that Thomas: (1) induced Daniels to leave his employment; (2) represented that Daniels would receive 100% of his TD & H stock and "fair value" for his T & D Properties stock; (3) failed to disclose material facts relating to his interpretation of the fair market value of the T & D Properties stock; (4) attempted "to force" Daniels to accept an unfair price for the T & D Properties stock in order for Daniels to receive full value for the TD & H stock; (5) took an adversarial negotiation stance; (6) did not fully disclose the value of the stock when considering his highest offer of $25,000 and the court's subsequent valuation of the stock at $53,128; (7) refused to share the cost of an independent appraiser; (8) refused to take the suggestions by Daniels for a resolution for the dispute; and (9) attempted to use his accountant's analysis of some property in an unfair manner.

In finding that Thomas breached his fiduciary duty to Daniels, a minority shareholder, the District Court primarily relied upon this Court's decisions in Skierka v. Skierka Bros., Inc. (1981),

13

192 Mont. 505, 629 P.2d 214; Deist v. Wachholz (1984), 208 Mont. 207, 678 P.2d 188; and Dunfee v. Baskin-Robbins (1986), 221 Mont. 447, 720 P.2d 1148. In each of these three cases, fiduciary duties were addressed. However, the relationship between the parties in those cases are substantially different from the present case, and therefore the court's reliance on them for defining Thomas' fiduciary duty was not appropriate.

In Deist, this Court determined that the unique relationship between a bank's agent and a customer created a fiduciary duty running from the agent to the customer. Deist, 208 Mont. at 219-20, 678 P.2d at 194-95. This Court in Dunfee determined that it did not have to decide whether the special facts and circumstances of that case gave rise to a fiduciary duty. Dunfee, 221 Mont. at 452, 720 P.2d at 1151. Neither of these two cases addressed the unique relationship between shareholders of a close corporation. While the facts of Skierka involved shareholders of a close corporation, the relationship between the shareholders in Skierka consisted of special circumstances that are not necessarily found between all shareholders of a close corporation. The trust relationship between the shareholders that this Court focused on in Skierka was that of an executor's trusteeship over the assets of the decedent's estate for the benefit of the devisees. Skierka, 192 Mont. at 513, 629 P.2d at 218. This Court therefore relied completely on the trustee's statutes--§§ 72-20-201 through -211, MCA (1979). These statutes are not applicable when the relationship between the two close corporation's shareholders does not involve an executor of an estate and the beneficiaries.

14

This Court has previously noted that the relationship between close corporations closely approximates the relationship between partners. Fox v. 7L Bar Ranch (1982), 198 Mont. 201, 212-13, 645 P.2d 929, 935. This Court, however, has never elaborated on the fiduciary duty between shareholders in a close corporation when no other type of relationship between the shareholders existed. The Supreme Judicial Court of Massachusetts in Donahue v. Rodd Electrotype Co. of New England, Inc. (Mass. 1975), 328 N.E.2d 505, has addressed the fiduciary duty in such a relationship. In Donahue, the Massachusetts court held that shareholders in a close corporation have a duty to act in the "utmost good faith and loyalty" to one another. Donahue, 328 N.E.2d at 515-17. The Massachusetts court further stated that "[t]hey may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." (Emphasis added.) Donahue, 328 N.E.2d at 515. See also, Solomon v. Atlantis Development, Inc. (Vt. 1986), 516 A.2d 132; Jones v. H.F. Ahmanson & Co. (Cal. 1969), 460 P.2d 464; Fix v. Fix Material Co., Inc. (Mo. Ct. App. 1976), 538 S.W.2d 351; Baker v. Commercial Body Builders, Inc. (Or. 1973), 507 P.2d 387.

The Massachusetts court subsequently refined this duty in Wilkes v. Springside Nursing Home, Inc. (Mass. 1976), 353 N.E.2d 657. In Wilkes, the court acknowledged that the controlling group in a close corporation have certain rights to what has been termed "selfish ownership" in the corporation which need to be balanced against their fiduciary obligation to minority stockholders and stated:

15

> Therefore, when minority stockholders in a close corporation bring suit against the majority alleging a breach of the strict good faith duty owed to them by the majority, we must carefully analyze the action taken by the controlling stockholders in the individual case. It must be asked whether the controlling group can demonstrate a legitimate business purpose for its action. . . . In asking this question, we acknowledge the fact that the controlling group in a close corporation must have some room to maneuver in establishing the business policy of the corporation. . . . If called on to settle a dispute, our courts must weigh the legitimate business purpose, if any, against the practicability of a less harmful alternative. (Citations omitted.)

Wilkes, 353 N.E.2d at 663.

We determine that the reasoning of the Massachusetts court is persuasive and also hold that the fiduciary duty between stockholders of a close corporation is one of the "utmost good faith and loyalty." However, the controlling group should not be stymied by a minority stockholder's grievances if the controlling group can demonstrate a legitimate business purpose and the minority stockholder cannot demonstrate a less harmful alternative.

The facts of the present case, as set forth above in the District Court's findings, do not exhibit a breach of the fiduciary duty by Thomas to the shareholders of T & D Properties. The evidence demonstrates that there were five shareholders in T & D Properties. Besides Daniels, who had three and one-half shares, the other shareholders are listed as Duanne C. Dean, with eighteen and one-half shares, Marilyn P. Thomas with eighteen and one-half shares, Sandra K. Cummings, with three and one-half shares, and Dorothy E. Lorang, who held three shares. Duanne Dean, Marilyn Thomas and Sandra Cummings received their shares from their husbands, Wayne Dean, T.H. Thomas and James Cummings, respectively.

16

Dorothy Lorang, the TD & H office manager, held her T & D Properties stock in her own name. Daniels initially had his three and one-half shares in his wife's name, but received it back in a dissolution settlement in 1980. Although Thomas' wife held his eighteen and one-half shares of T & D Properties, neither party disputes Thomas' real interest in T & D Properties. Rather, Thomas testified that he controlled the eighteen and one-half shares of the forty-seven shares of T & D Properties, or approximately thirty-nine percent. We therefore determine that Thomas was a majority shareholder in T & D Properties for the purpose of this appeal. To hold otherwise would ignore the realities of the situation in this close corporation and rely merely upon technicalities.

When negotiating for the purchase of Daniels' shares of T & D Properties, Thomas' fiduciary duty of the "utmost good faith and loyalty" was to all of the shareholders of T & D Properties, not just to Daniels. And as the evidence demonstrates, Daniels was not the only minority shareholder, Lorang and Cummings were also minority shareholders. When applying the balancing test, we hold that Thomas successfully demonstrated that his duty to these other shareholders was not to pay Daniels a price for Daniels' three and one-half shares that the corporation could not afford so as not to harm the other shareholders or the corporation. Daniels, however, failed to demonstrate the practicability of a less harmful alternative, he merely insisted that the corporation buy his shares at the price he named. This Court is not in a position to make a corporation's business decision when the controlling group can

demonstrate a legitimate business purpose for its decision and the minority shareholder cannot demonstrate the practicability of a less harmful alternative. Additionally, the evidence demonstrates that Thomas offered to step aside and let Jack Holland handle the negotiations with Daniels, thereby eliminating any potential conflict of interest or undue influence.

Thomas was also a director of T & D Properties, therefore Thomas' actions must also be measured by the "business judgment rule." In Ski Roundtop, Inc. v. Hall (1983), 202 Mont. 260, 658 P.2d 1071, this Court adopted the business judgment rule. This Court recognized that when a reasonable basis exists to indicate that the directors of a corporation acted in good faith, the directors are immunized from liability for honest errors. Ski Roundtop, Inc., 202 Mont. at 273, 658 P.2d at 1078. Daniels failed to offer proof that Thomas' actions were unreasonable in that they would not have been taken by "'an ordinarily prudent man . . . in the management of his own affairs of like magnitude and importance.'" Alaska Plastics, Inc. v. Coppock (Alaska 1980), 621 P.2d 270, 278 (quoting Nanfito v. Tekseed Hybrid Co. (D. Neb. 1972), 341 F.Supp. 240, 244). Judges are not business experts and therefore should not substitute their judgment for the judgment of the directors. Alaska Plastics, Inc., 621 P.2d at 278. We hold that Thomas acted prudently and in accordance with the business judgment rule.

C. Oppression

The District Court also found that it had the power in equity to liquidate the corporation's assets or require the purchase of

18

a minority shareholder's shares for fair market value whenever the acts of those that control the corporation's actions are illegal, oppressive or fraudulent (citing § 35-1-921, MCA; Maddox, 206 Mont. 1, 669 P.2d 230; and Skierka, 192 Mont. 505, 629 P.2d 214). The District Court then found that Thomas' negotiation tactics with Daniels were oppressive to Daniels. In particular, the District Court found that Thomas' actions were oppressive when he (1) attempted to force Daniels to accept his valuation of stock in T & D Properties by tying Daniels' acceptance of the T & D Properties stock to the TD & H shareholder agreement; (2) refused to waive the anti-competition clause unless Daniels would accept Thomas' $20,458 offer for his T & D Properties stock; (3) used his position as president of TD & H to influence the negotiations with Daniels and T & D Properties; and (4) mentioned to Daniels in the May 13, 1986 meeting that if Daniels did not sell his stock in T & D Properties that TD & H could, in effect, bleed the assets from T & D Properties. The court therefore determined that Thomas used unfair negotiation tactics and that he unfairly used his positions with TD & H and T & D Properties to influence the negotiations with Daniels. The court found these actions by Thomas were oppressive and rose to the level in which the court could require T & D Properties to purchase Daniels' three and one-half shares.

This Court has held that oppression may be more easily found in a close corporation than a larger, public corporation because shares in a closely held corporation are not offered for public sale. Fox, 198 Mont. at 209, 645 P.2d at 933; Skierka, 192 Mont.

19

at 519, 619 P.2d at 221. We have also held that when addressing these type of cases, we will proceed on a case-by-case basis. Fox, 198 Mont. at 210, 645 P.2d at 933; Skierka, 192 Mont. at 519, 629 P.2d at 221. While the District Court correctly cited § 35-1-921, MCA, as the statute that allows a court to dissolve a corporation upon a showing of oppression, we hold, as discussed below, that Thomas' actions did not rise to the level that would allow a court to take the drastic remedy of dissolution or to require a close corporation to purchase a minority shareholder's stock.

A review of the other Montana decisions addressing closely held corporations and oppressive behavior by the controlling shareholders is helpful. In Skierka, the finding of oppression was based on the exclusion of the minority shareholder from participation in the operation of the corporation. Skierka, 192 Mont. at 518, 629 P.2d at 221. In Fox, we upheld the district court which found that the controlling shareholders' conduct revealed a calculated and oppressive plan designed to deprive the minority shareholder of his rightful portion of the corporate holdings and profits by making sure he did not have access to them. Fox, 198 Mont. at 210, 645 P.2d at 933. The district court in Fox further found that the minority shareholder had been effectively deprived of any voice in management. Fox, 198 Mont. at 210, 645 P.2d at 934. This Court then held that these actions by the controlling shareholders violated the minority shareholder's reasonable expectations of realizing monetary remuneration and of having a voice in management. Fox, 198 Mont. at 210, 645 P.2d at 934. On the other hand, the district court in Maddox found that

20

although the controlling shareholders' conduct "was not per forma as to corporate law or the corporation's by-laws, 'its informality was not oppressive toward the plaintiff, nor was she defrauded.'" Maddox, 206 Mont. at 9, 669 P.2d at 234. This Court therefore affirmed the district court's conclusion in Maddox of denying liquidation. Maddox, 206 Mont at 13, 669 P.2d at 236.

In the present case, Thomas' actions were more consistent with negotiation tactics than oppressive actions. Merely because Thomas attached conditions to his offer does not necessarily mean that his actions were oppressive. Additionally, the District Court's finding that Thomas attempted to force Daniels to accept a settlement by tying in the TD & H shareholder agreement completely ignores the evidence that Thomas stepped aside in the negotiations and Jack Holland took over and attempted to settle the claims against the corporations separately. The court's finding that Thomas made a statement in which he threatened to bleed the assets from T & D Properties also does not rise to the level of oppressive conduct that would warrant the ordering of T & D Properties to buy Daniels' shares. Possible future oppressive actions are not sufficient to invoke § 35-1-921, MCA. On the other hand, if Thomas were to carry through with his threats, Daniels may then have had a legitimate cause of action in which he could allege that Thomas was engaging in oppressive actions against him as a minority shareholder. However, the mere possibility of oppression is not sufficient to warrant the remedy the District Court ordered here.

In addition, Thomas offered Daniels up to $25,000 for his shares in T & D Properties. Although Thomas also seemingly

21

attached other conditions to this offer, Daniels did not have to accept the offer. In fact, Daniels rejected all of Thomas' offers. The Supreme Court of Alaska addressed a similar situation in Alaska Plastics, Inc. v. Coppock (Alaska 1980), 621 P.2d 270. Alaska Plastics, Inc. involved the rights of a minority shareholder in a close corporation. In particular, the minority shareholder, Muir, held one-sixth of the Alaska Plastics, Inc. shares. The controlling shareholders consistently failed to inform Muir of shareholder meetings or informed her only a few hours before the meetings. In 1971 and 1972, the controlling group also traveled to Seattle for a shareholder's meeting and brought their spouses at the company's expense even though there was no business purpose for doing so. The controlling shareholders also voted themselves each an annual $3,000 director fee, however they never paid dividends. Coincidentally, Muir was the only shareholder who was not a director. Muir never received any money from the corporation. In May, 1974, the controlling shareholders offered Muir $15,000 for her shares in Alaska Plastics, Inc. Muir rejected and subsequently hired an accountant to investigate the company's books. The accountant estimated the value of Muir's stock between $23,000 and $40,000. In 1975, Muir offered her stock to the corporation for $40,000. The board subsequently offered her $20,000 which she again rejected. Muir then filed a complaint.

In its findings of fact and conclusions of law, the district court concluded that:

> "[T]he continued retention by Plaintiff [Muir]
> of one-sixth of the shares in Alaska Plastics,
> Inc. . . . was oppressive to Plaintiff and

> . . . an appropriate remedy would be to direct the transfer of Plaintiff's shares to Alaska Plastics, Inc. in exchange for a fair and equitable value. . . ."

Alaska Plastics, Inc., 621 P.2d at 273. The court then ordered the corporation to purchase Muir's shares for $32,000. The Alaska Supreme Court rejected the lower court's conclusion that once the corporation made an offer to Muir it was under an obligation to purchase her stock at a "fair" price, regardless of the price the corporation had initially offered. Alaska Plastics, Inc., 621 P.2d at 276.

Likewise, merely because T & D Properties had made an offer for Daniels' stock and merely because Thomas testified that they were willing to pay fair market value if they could agree to the terms, does not obligate the corporation to purchase Daniels' T & D Properties stock. The record also demonstrates that the minority shareholder, Lorang, had also wanted to sell her shares in T & D Properties to the corporation, but the corporation did not have the funds to purchase them. Daniels' insistence that the corporation should nonetheless purchase his shares in T & D Properties merely because of possible future oppression by the controlling shareholders is not persuasive. Furthermore, we agree with the court in Alaska Plastics, Inc. in which it stated that:

> We are not aware of any authority which would allow a court to order specific performance on the basis of an unaccepted offer, particularly on terms totally different from those offered. Such a rule would place a court in the impossible position of making and enforcing contracts between unwilling parties.

Alaska Plastics, Inc., 621 P.2d at 276.

23

We hold that Thomas' actions were not so oppressive as to warrant the appraisal remedy ordered by the District Court.

## D. Constructive Fraud

The District Court concluded Thomas' <u>attempts</u> to gain an unfair advantage over Daniels constituted constructive fraud under § 28-2-406, MCA. Section 28-2-406, MCA, provides that:

> Constructive fraud consists in:
>
> (1) any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him; . . .

As already determined above, Thomas did not breach his fiduciary duty to Daniels. In addition, Thomas did not mislead Daniels to his prejudice. Thomas' actions were not misleading but merely negotiation tactics. Daniels rejected all of Thomas' offers, and then failed to prove how he was thus prejudiced.

We hold that the District Court erred in granting Daniels an appraisal remedy under § 35-1-921, MCA.

In light of our above holdings in this case, this Court does not need to address the following three issues raised on appeal: (1) whether the pleadings fairly apprised the defendants of the nature of the claims against them; (2) whether the judgment rendered by the District Court lies against all three defendants (TD & H, T.H. Thomas and T & D Properties); and (3) whether the District Court erred in awarding Daniels' appraisal fees.

The last issue raised on appeal is whether the restrictive covenant clause in the TD & H buy-sell agreement is void under

24

§ 28-2-703, MCA.

The District Court found that as a matter of law, the restrictive covenant found in the buy-sell agreement at paragraph seventeen was void pursuant to § 28-2-703, MCA. Paragraph seventeen of the Agreement states that:

> Inasmuch as a shareholder has access to confidential information concerning the corporate business, it is mutually agreed that the compensation for a terminated shareholder who obtains employment with a competitive firm or enters any form of business in competition with the corporation shall be paid for his stock at the rate of seventy-five percent (75%) of the fair value.

We disagree with the District Court on this issue.

Section 28-2-703, MCA, states that "Contracts in restraint of trade [are] generally void. Any contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, otherwise than is provided for by 28-2-704 or 28-2-705, is to that extent void." (Emphasis added.) The two exceptions allow parties to agree that upon either the sale of goodwill of a business or the dissolution of a partnership, one or more of the parties will refrain from carrying on a similar business within a narrow designated area. Sections 28-2-704 and -705, MCA.

The contract in this case is a share purchase agreement. This Court has applied § 28-2-703, MCA, to both employment contracts and to a lease which prohibited a competing full service restaurant within the same building. See, State Medical Oxygen and Supply, Inc. v. American Medical Oxygen Co. (1989), 240 Mont. 70, 782 P.2d 1272; Dobbins, DeGuire & Tucker v. Rutherford, MacDonald & Olson

25

(1985), 218 Mont. 392, 708 P.2d 577; O'Neill v. Ferraro (1979), 182 Mont. 214, 596 P.2d 197. Since § 28-2-703, MCA, applies to any contract, the statute would also apply to a share purchase agreement. However, under certain factual circumstances a covenant restraining a lawful profession, trade or business of any kind may be acceptable if it passes a three part test of reasonableness. Under this test, a covenant not to compete is reasonable if it is: (1) limited in operation either as to time or place; (2) based upon some good consideration; and (3) affords reasonable protection for and not impose an unreasonable burden upon the employer, the employee, or the public. State Medical Oxygen and Supply, Inc., 240 Mont. at 74, 782 P.2d at 1275; Dobbins, 218 Mont. at 396-97, 708 P.2d at 580.

Defendants in this case assert that the agreement does not violate § 28-2-703, MCA, and therefore they have the burden of showing that the agreement does not violate the statute. State Medical Oxygen and Supply, Inc., 240 Mont. at 74, 782 P.2d at 1275; First American Ins. Agency v. Gould (1983), 203 Mont. 217, 223, 661 P.2d 451, 454. Defendants did not assert nor prove that the sale of goodwill of a business or the dissolution of a partnership occurred. Therefore, neither of the statutory exceptions--§§ 28-2-704 or -705, MCA--apply.

This Court must next apply the three part test to determine whether the covenant is reasonable. The first essential criterion that the defendants must demonstrate is that the covenant is limited in operation either as to time or place. Defendants assert that paragraph sixteen of the TD & H share purchase agreement

26

satisfies the time criterion.  Paragraph sixteen states that:

> A shareholder who voluntarily or involuntarily terminates employment except for purposes of retirement, death, or disability, shall be paid for his shares at the fair value at the time of termination on a pro rata basis between the audits prior to and after termination.  Payment will be made one hundred twenty (120) days after the audit following date of termination, but in no case sooner than two hundred forty (240) days after the date of termination.

While paragraph seventeen specifies how much a terminated shareholder will be paid under certain conditions, paragraph sixteen specifies when the payment will be made.  The agreement must be read as a whole.  Section 28-3-202, MCA; St. Paul Fire and Marine Ins. Co. v. Cumiskey (1983), 204 Mont. 350, 363, 665 P.2d 223, 229.  Upon reading the agreement, the restrictive covenant is definitely limited as to time.

The second criterion that the defendants must demonstrate is that the restrictive covenant is based upon some good consideration.  The consideration flowing to Daniels under this covenant was his access to confidential information concerning the corporate business.  The corporation's consideration under this covenant was requiring the corporation to pay only seventy-five percent (75%) of the fair market value of the shareholder's stock. Defendants therefore demonstrated that the restrictive covenant was based upon some good consideration.

The third and last criterion that the defendants must demonstrate is that the covenant affords reasonable protection for and not impose an unreasonable burden upon the employer, the

27

employee, or the public. The covenant affords the corporation reasonable protection by deterring, but not prohibiting, competition with them for a period not to exceed two hundred forty (240) days. Deterring competition for this amount of time or requiring the terminated shareholder to take only seventy-five percent (75%) of the stock's fair market value does not impose an unreasonable burden on the corporation, the terminated shareholder, or the public.

On cross-appeal, Daniels raises the issue of whether the District Court erred by not awarding Daniels his attorney's fees. However, in light of our holdings in this case, we do not need to address this issue.

Reversed and remanded for proceedings consistent with this opinion.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

28

Justice John C. Sheehy, dissenting:

The majority opinion is completely out of focus with the case which was tried in the Cascade County District Court, and on which the District Court entered judgment.

For example, an essential element of the District Court's findings is that on April 16, 1986, at a meeting between Thomas, as president of T & D Properties, and Daniels, Thomas agreed that T & D Properties would purchase Daniels' stock (3½ shares) in T & D Properties at fair market value. The majority opinion sets that finding aside. The majority opinion relies in part on a portion of Thomas's testimony, without any reference to the other testimony in the record which supports the District Court finding.

In setting aside the District Court's finding that Thomas had agreed to buy the T & D Properties stock from Daniels, no reference or mention is made by the majority opinion of a second finding made by the District Court that on May 13, 1986, the parties met, and again agreed on the method to be used to determine the value of the T & D Properties stock. The District Court found:

> 23. On May 13, 1986, Daniels and his accountant, Dan Eigenman, met with Thomas and his accountants, Dale Grabofsky and Curt Ammundson, at the offices of Hamilton and Misfeldt in Great Falls. The only disagreement with regard to the termination agreement was the value of the T & D stock. The dispute centered around the value of certain real property including the land known as Western Properties and the Great Falls office building. There was no major disagreement about the value of the other assets of T & D. Both parties agreed to use the method of determining the assets less liabilities, with a net asset value to be divided by the total issued shares of T & D and that figure multiplied by Daniels' three and ½ shares.

29

On April 16, 1986 (the District Court stated the date to be April 17, 1986) Thomas and Daniels met in Great Falls and there entered into a mutual agreement for Daniels to terminate his employment. In that meeting, they mutually concluded what would happen with respect with the T D & H stock owned by Daniels, and also the T & D Properties stock which he owned. The evidence with respect to that conversation from Daniels is:

> Q. Well, let's tell the court then what Mr. Thomas said to you with regard to your leaving the employment.
>
> A. Well, one of my concerns, you know, was that my training and everything was in engineering, my education and all my experience, and I mentioned, you know, how are we going to resolve the issues, you know, that needed to be resolved. And, Tom offered first of all, you know, as far as T D & H stock, he would waive the clause that requires I only get 75% of the stock. And, he said, you know, you have been a good employee for a long time. We have had a good relationship. He said we can close this out, you know, we can get any information we need from you on jobs that are ongoing. If you cooperate, you know, and take care of those loose ends, we will waive that clause.
>
> Q. All right. What did he say?
>
> A. We discussed very briefly the T & D Property, we also touched on retirement plans. T & D Properties said we will pay full fair market value for that. We will turn the pension plans over to you whatever you wish to do. I think we mentioned insurance that I would have an option to pick that up on my own. (Emphasis added.)

The majority opinion recites that there was no offer and no acceptance but the testimony is contrariwise. Mr. Thomas testified:

> Q. (By Mr. Lynch) Now, Mr. Daniels, you agreed to leave an employment with the firm of Thomas, Dean & Hoskins, did you not?
>
> A. Based on the conditions that were discussed on the 16th of April. (Emphasis added.)

30

Following the April 16, 1986 meeting, Thomas met with his attorney for the purpose of making up a formal written agreement that related to that meeting. However in that agreement, instead of providing for fair market value for the T & D Properties stock, Thomas inserted a figure of $20,428. That had not been agreed upon by the parties at the April 16 meeting. In connection with that, Daniels testified:

> Q. Did Mr. Thomas, before sending you this check, ever consult with you or talk with you about the results of the stock?
>
> A. It was discussed on the 16th of April.
>
> Q. And what was your impression at that time?
>
> Q. That I would be paid a fair market value for the stock.

The majority opinion to the contrary notwithstanding, there was adequate, substantial and competent evidence to support the findings of the District Court that agreement had been reached that Daniels would receive fair market value for the T & D Properties stock.

The District Court also determined that that agreement included: "Determining the fair market value of the T & D Properties stock contemplated the use of an appraiser to value the assets (real property) of T & D." Thomas refused to get an appraiser, to pay for an appraiser, and told Daniels that if an appraiser was obtained, he would not regard it or rely on it. Thus Thomas led Daniels to believe at the April 16 meeting that he would receive fair value for his T & D Properties stock, as a part of the

31

termination agreement, but later refused to perform that part of the agreement by any reference to a fair appraisal of what the market value of the T & D stock should be.

When I say that the majority opinion is out of focus with the case that was tried in District Court, I mean that the opinion as promulgated has no relation to the situation faced by the District Court upon which it made a judgment. For that reason, I will discuss what the District Court found, and the implications that arise from the legal relationships that the court found.

Thomas, as president and director of T & D Properties, owed Daniels, a minority stockholder, a fiduciary obligation. At all times at trial, Thomas recognized he was a fiduciary. There was no argument on that subject. Out of the fiduciary relationship, the District Court concluded that Thomas, as fiduciary, was bound to act in the "highest good faith towards his beneficiary and not to obtain any advantage therein over Daniels by the slightest misrepresentation, concealment, threat or adverse pressure of any kind." Skierka v. Skierka Brothers, Inc. (1981), 192 Mont. 505, 629 P.2d 214; Section 72-20-201, MCA (Repealed, 1989). The fiduciary was bound not to have or acquire an interest which would be adverse to the interests of his beneficiary without immediately informing him of it and removing himself if requested. The fiduciary had an affirmative duty to make sure that the beneficiary retained a position of equity; and the fiduciary was obligated in all transactions with his beneficiary to refrain from any unfair persuasion for the purpose of obtaining an advantage over his

beneficiary.

The majority state that the trustee statutes are not applicable to a fiduciary when a relationship between two close corporation shareholders does not involve an executor of an estate of the beneficiaries. That is entirely an incorrect statement of law. When a fiduciary relationship exists, the laws applicable to the fiduciary are those relating to constructive fraud. Bradbury v. Nagelhus (1957), 132 Mont. 417, 319 P.2d 503. The statute states that constructive fraud involves "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person at fault or anyone claiming under him by misleading another to his prejudice." Section 28-2-406(1), MCA. Thus, a constructive trust arises under operation of law and is valid. Section 72-33-208(3), MCA; § 72-33-220, MCA. When the majority state that the fiduciary duty between stockholders of a close corporation is one of the "utmost good faith and loyalty," the majority in reality are stating the duties of a trustee in a constructive trust. There can be no argument in this case that a fiduciary relationship exists between Thomas, the corporation, and the minority shareholder. The proposed findings of fact submitted by Thomas in this case accepted the premise that Thomas was a fiduciary. No issue of any kind was raised in the case that his status was any less than a fiduciary. The parties agreed a fiduciary relationship existed.

When the majority then insert the "business judgment" rule, they erroneously mix two incongruent concepts. The "business judgment" rule applies to the acts of directors and officers to

33

hold them free from liability for honest errors, for mistakes of judgment, when they act without corrupt motive and in good faith, that is for mistakes that may properly be classified under the head of honest mistakes. Ski Roundtop, Inc. v. Hall (1983), 202 Mont. 260, 658 P.2d 1071, 1078 (1983). The "business judgment" rule applies to officers and directors acting in a corporate capacity, when no fiduciary relationship is involved. When a fiduciary status is established, the actions of officers and directors are examined, not under the "business judgment rule" but rather whether the fiduciary exercised the utmost good faith and loyalty, in this case towards all of the shareholders of T & D Properties.

The majority resort to a "balancing test," contending that Thomas' duty was to protect the other shareholders by not paying Daniels a price for his shares that the corporation could not afford so as not to harm the other shareholders of the corporation. There is absolutely no proof of this in the record. In any event, there could not be any such proof because a fair market value of Daniels' stock would likewise be a fair market value of all of the other shareholders' stock. The majority talk about balance; it is a see-saw, tipped on one end against Daniels.

Thomas breached the duties of a fiduciary. The court concluded he had violated his duty by inducing Daniels to leave his employment through representations that Daniels would be paid 100 percent of the value of his stock in the T D & H corporation, and the "fair value" of his stock for the T & D Properties corporation. Thomas intended to force Daniels to accept an unfair price for his

T & D Properties stock in order for Daniels to receive the full value of the T D & H stock. (Thomas had written that the T D & H stock anti-competition clause would be waived if Daniels would accept Thomas' valuation of the T & D Properties stock.) Although Thomas had authority from his board of directors to offer $35,000 for the T & D Properties stock to Daniels, he never transmitted that offer to Daniels and adamantly stayed on the $25,000 figure. Thomas stood to benefit from his dealings with Daniels, because he owned 39 percent of the stock in T & D Properties. For a fiduciary to gain any advantage through breach of a duty constitutes constructive fraud. Deist v. Wachholz (1984), 208 Mont. 207, 678 P.2d 188, 193; Ryckman v. Wildwood (1982), 197 Mont. 154, 641 P.2d 467, 472.

The District Court found that at the April 16, 1986 meeting, Thomas had agreed to waive the anti-competition provision of the share-purchase agreement that applied to the T D & H stock.

The District Court further found that Daniels, relying upon the statements made by Thomas concerning the waiver, began an engineering business in Belgrade on July 1, 1986. Thereafter Thomas would not authorize a waiver of the anti-competition clause unless Daniels agreed to accept the valuation of the T & D Properties stock provided by Thomas. Indeed, by letter dated September 17, 1986, Thomas informed Daniels that the full payment of the value of Daniels' T D & H stock was contingent on his accepting Thomas' value of Daniels' T & D Properties stock. From all of the problems facing Daniels, the District Court found that

35

he was stranded in a closely-held situation which was hostile and adverse to him as a minority shareholder. The District Court found that T & D Properties and Thomas agreed to pay fair market value to Daniels for Daniels' shares of stock in the corporation, but that Thomas' refusal until the time of trial to use an appraiser or recognize one was oppressive and in violation of Thomas' fiduciary duty. It was on that premise that the District Court found that the only remedy proper was to order the corporation to purchase Daniels' stock at fair market value. Such a purchase would not result in any disruption of the corporate business nor any injury to the public, and would promote the best interest of T & D Properties.

The majority opinion intimates that neither the District Court nor this Court can grant an equitable remedy to a minority shareholder in a close corporation unless the minority shareholder has asked for liquidation. That intimation is an unnecessary extension of corporate law and has no basis in the case which the majority cited in support. For example, in Maddox v. Norman (1983), 206 Mont. 1, 669 P.2d 230, the minority shareholder petitioned for liquidation, but the District Court found and this Court agreed that the equities did not support his contention that liquidation is a proper remedy. Instead, this Court stated that the equitable powers of district courts in disputes among shareholders of close corporations allowed the court to fashion reasonable equitable remedies. This Court said:

> Our prior decisions have recognized the general equitable
> powers of district courts over disputes arising among

shareholders of close corporations (citing authority). In <u>Thisted</u>, we recognized that power to choose from a broad range of equitable remedies is necessary to resolve disputes of this nature: "[b]y [their] very nature, intracorporate problems arising in a close corporation demand the unusual and extraordinary remedies available only in a court of equity" 147 Mont. 14, 409 P.2d at 820.

Accordingly, a court sitting in equity is empowered to determine the questions involved in a case "and do complete justice." (Citing authority.) This includes the power to fashion an equitable result. Rase v. Castle Mountain Ranch, Inc. (1981), ___ Mont. ___, 631 P.2d 680, 687, 38 St.Rep. 992, 1000.

206 Mont. at 14, 669 P.2d at 237.

Thus the right of the minority shareholder to get equitable relief from oppressive conduct by controlling shareholders is not dependent on a request for liquidation, but whether equity is necessary to fashion a just resolution. The view of this Court expressed in <u>Maddox</u>, <u>Skierka</u>, and other cases, is in tune with the Montana Close Corporation Act, adopted in 1987 (§ 35-9-101 et seq.). That Act provides, in § 35-9-501, MCA, that a shareholder in a statutory close corporation could petition the district court for a corporate purchase of his shares if the directors who control the corporation have acted in a manner that was "illegal, oppressive, fraudulent, or unfairly prejudicial to the petitioner." See Bahls and Quist, <u>The ABA Model Statutory Close Corporation Act: A New Opportunity for "Made in Montana" Corporations,</u> 49 Mont. Law Review, page 66, et seq.

I would therefore affirm the District Court's holding that Daniels is entitled to have his shares purchased at fair market value and that the fair market value is that found by the District Court. I would make the judgment effective against T. H. Thomas

37

individually and T & D Properties, and not against the other corporation, T D & H. I would find no error in awarding Daniels his appraisal fees. I would deny Daniels' cross-appeal for attorneys fees.

Next comes the question of how Daniels ought to be paid for his T D & H stock (a separate corporation). The majority opinion finds that the restrictive agreement in the share-purchase agreement adopted by T D & H does not violate the anti-competitive provisions of Montana law. That portion of the majority opinion is clearly wrong.

We repeat the pertinent provision of the shareholder agreement:

> Inasmuch as a shareholder has access to confidential information concerning the corporate business, it is mutually agreed that the compensation for a terminated shareholder who obtains employment with a competitive firm or enters any form of business in competition with the corporation shall be paid for his stock at the rate of 75% (seventy-five percent) of the fair value.

Under Montana law (§ 28-2-703, MCA) any contract by which anyone is restrained from exercising a lawful profession, trade or business of any kind is to that extent void, subject to certain exceptions not pertinent here. The provision above quoted of the share-purchase agreement restrains Daniels from his lawful profession as an engineer by penalizing him up to 25% of the value of his T D & H stock. The District Court found that "there is no limitation in the anti-competition provision therein as to the duration of its prohibition or the territorial scope of his prohibition. The provision, read literally, prohibits the

38

plaintiff from competing with the defendants anywhere in the world and until the end of time." Clearly, the District Court understood what it read in the provision.

The majority opinion contends that the anti-competition provision is limited as to time because another provision of the share-purchase agreement provides that payment for stock shall be made to a shareholder 120 days after the audit following the date of termination, but in no case sooner than 240 days after the date of termination. Obviously, as the District Court found, that provision relates to when payment is to be made and not to the duration of the anti-competition provision. Two things militate against the majority opinion's position: (1) At the time of the trial, more than 240 days following the termination, Thomas was not willing to waive the anti-competition petition provision, and pay Daniels 100 percent of the value of his stock; and (2) if the anti-competition provision is valid, as the majority opinion contends, it could be specifically enforced even after payment for the stock that had been made under the other provision of the share-purchase agreement. We should declare the anti-competition provision of the share-purchase agreement void. Dobbins, DeGuire & Tucker v. Rutherford, MacDonald and Olson (1985), 218 Mont. 392, 708 P.2d 577; J T Miller Company v. Madel (1978), 176 Mont. 49, 575 P.2d 1321.

At the outset, I stated that the majority opinion was out of focus. The majority have set aside the District Court's findings of fact without finding them clearly erroneous; and, they have

39

found valid a clearly anti-competitive provision of the share-purchase agreement. On these points the majority have diverged from rather than converged on previous decisions and statutory law, and made vague and blurry for future cases the position of this Court on these points.

_____
                Justice

I concur in the foregoing dissent of Justice John C. Sheehy.

_____
                Justice